James R. SEWELL, Petitioner-Appellee,

v.

Harold J. CARDWELL, Warden, Ohio State Penitentiary, Respondent-Appellant.

No. 71-1482.

United States Court of Appeals, Sixth Circuit.

Jan. 27, 1972.

Leo J. Conway, Asst. Atty. Gen., Columbus, Ohio, William J. Brown, Atty.

Gen. of Ohio, on brief, for respondent-appellant.

William J. Coyne, Asst. Pros. Atty., Cleveland, Ohio, John T. Corrigan, Pros. Atty. of Cuyahoga County, Ohio, Cleveland, Ohio, on brief, for intervenor.

James Kozelek, Columbus, Ohio, for petitioner-appellee.

Before WEICK and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WEICK, Circuit Judge.

Sewell was convicted by a jury in the Common Pleas Court of Cuyahoga County, Ohio, on an indictment charging him with placing and exploding a bomb on the property of Charles Gard, in violation of Revised Code of Ohio, Section 2907.081. His conviction was affirmed by the Court of Appeals of the Eighth District. The Supreme Court of Ohio dismissed his appeal, filed as of right, on the ground that it did not present a substantial constitutional question. The Supreme Court of Ohio also overruled his motion for leave to appeal, and denied his petition for a rehearing. Certiorari was denied by the Supreme Court of the United States.

After exhausing his state remedies, Sewell filed an application in the United States District Court for a writ of habeas corpus, alleging that his constitutional rights had been violated. By agreement of the parties the Court heard and determined the application on a transcript of the trial record.

The District Court, 326 F.Supp. 853, granted the writ of habeas corpus, holding that "the pretrial identification procedures used in this case so tainted the in-trial identification as to deny petitioner's right to due process of law." The Court relied on Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L. Ed.2d 402 (1969). We reverse.

Around midnight on June 28, 1966, Charles Gard and his wife, who lived at 2604 East Overlook Road, Cleveland Heights, Ohio, were awakened from their sleep by the noise of glass break-

ing in the living room of their home. They got up and looked out their front bedroom window and saw a car driving away from their home. They then heard a heavy explosion.

Camilla Burby, a 19-year-old student at Rosemont College, lived next door to the east of the Gard residence. She was entertaining some of her friends on the rear patio of her residence. These friends included Michelle Day, Brent Murphy and Martin Mullin, all of whom testified as witnesses at Sewell's trial. They testified that they heard the glass breaking at the Gard residence, ran down the Burby driveway, and saw Sewell running from the front of the Gard residence to his station wagon which was parked, with the motor running, under a street light. They chased after Sewell and saw his face as he stopped underneath the street light and looked at them when they were from ten to thirty feet away from him.

Sewell got in his station wagon and started to drive away. The students chased after the car, and Miss Burby saw the license plate number which was visible because of the car's tail light. She called out the license number. At the trial she testified:

"A Well, I continued to chase the car up the street until I got close enough to see the license number.

"Q Do you recall what that license number was?

"A Yes, I do.

"Q What is that?

"A RV 840.

"Q What did you do when you saw this license number?

"A I called it out." (107a–108a)

Michelle Day and Martin Mullin obtained only a partial reading of the li-

cense plate. Murphy and Mullin observed a sticker on the bumper which Murphy identified as an "Evans sticker" (the name of the car dealer).

The students then started to return to the Burby residence when they heard the loud noise of the bomb explosion. The police were called by telephone from the Burby residence. When the police officers arrived they were furnished the license number on the station wagon, from which they ascertained that the station wagon belonged to Sewell. There was some delay in arresting him because his address was incorrectly stated on his application for a license.[1]

After arresting Sewell, the police took the students to the police station about six o'clock, a. m., for the purpose of identifying the station wagon. They all positively identified the station wagon which was parked in front of the police station.

The students were then taken to a room inside the police station, from which there was a clear view of an adjoining parking lot. They were asked by a policeman to look out the window.[2] They saw a policeman walking across the parking lot with a man. All of the students identified the man as the defendant, although he was not wearing the same clothes as he had on at the time of the bombing; nor was he wearing glasses.

Later in the evening the students were again taken to the police station to view separately a lineup of five men who were similarly dressed. Each student identified the defendant as the man whom he had seen running from the Gard residence.

At the trial each of the students positively identified Sewell as the man whom he saw running from the Gard home. Each student described the de-

---

1. Miss Day testified that the station wagon was a compact turquoise Chevrolet, of the vintage of about 1962. Murphy and Mullins also testified that the car was a compact station wagon, but did not agree on the make of the car, one stating he thought it was a Tempest, and the other a Comet.

2. One of the students testified that the officer asked him if the man looked like the one he had seen the night before.

fendant, the clothes he was wearing, and even estimated his age.

Each student positively identified the station wagon parked at the police station as the car parked under the street light in front of the Gard residence, which the defendant drove away when the students were chasing him. At the trial the students also identified a photograph of the station wagon.

Sewell took the witness stand and denied that he placed the bomb. He testified that late in the evening of June 27, 1966, he left his home in Willoughby Hills and drove to an apartment on East 107th Street, where his stepson, Jack, resided. He entered a parking lot adjacent to the apartment and looked up to the windows of his stepson's suite and, seeing no lights, turned around and drove home, arriving there shortly after eleven o'clock, p. m. The stepson's apartment was about two miles from the Gard residence.

On cross-examination, Sewell was unable to state how many floors were in the apartment building, which window was his stepson's suite, the length of the apartment building, or how many windows faced the parking lot. He testified that when he arrived home he watched television for a while and then went to bed. He was awakened early in the morning by the Cleveland Heights police who arrested him.

Sewell testified that he was employed as a dredgeman. He admitted that he had been convicted of robbery in 1941, and had served time in the Mansfield Reformatory. He was again convicted of armed robbery in 1945 and served time in the Ohio State penitentiary.

Prior to the trial, Sewell, who was represented by able counsel experienced in the trial of criminal cases, made motions to suppress the identifications of each of the students, which motions were denied after a hearing. He renewed the motions at the trial and requested permission to conduct voir dire examinations of the students in the absence of the jury, which request the Court granted, but denied the motions to suppress after Michelle Day had testified.

The District Court was of the view that the students' opportunity to view Sewell at the time of the explosion did not provide an independent basis for in-court identification. The Court was of the view that the one-man show up was suggestive, and that there was no need for the suggestive confrontation employed in this case. We disagree.

We realize that all too frequently today some members of the public who witness the commission of serious crimes, do not want to get involved, and do nothing either to help the victims or even to testify.

Here, the conduct of these students was exemplary and refreshing. They did get involved. When they heard the breaking of glass in the home of a next-door neighbor they left their party which they had been enjoying, and ran down the driveway and chased after the bomber. They saw his face under the street light. While it was not for long, they were able to positively identify him as he stopped under the street light and looked at them. They were able to describe him and they even testified as to how he was dressed, and that he wore glasses. In addition, they chased after his car as he was leaving the scene. One of the young ladies, Miss Burby, who ran after the car, was able to see the license plate number and call it out. Another of the witnesses was able to see two of the numbers. Two of the students saw the dealer's sticker on the bumper. They positively identified the station wagon at the police station and also in court. The identification of the station wagon, which admittedly belonged to Sewell, corroborated and supported their in-court identification of Sewell.

The fact that their testimony varied somewhat in their descriptions does not vitiate their identifications as a matter of law. The weight to be given their testimony is for the jury to determine. United States v. Black, 412 F.2d 687 (6th Cir. 1969).

■ The bombing took place prior to the Supreme Court decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). These decisions are not retroactively applied, but the conduct of the identification procedures may be so unnecessarily suggestive and conducive to mistaken identification as to constitute a denial of due process of law. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). This must be judged by the totality of the circumstances.

In Bates v. United States, 132 U.S. App.D.C. 36, 405 F.2d 1104 (1968), Circuit Judge, now Chief Justice, Burger stated:

"There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy."

To the same effect is United States ex rel. Springle v. Follette, 435 F.2d 1380 (2d Cir. 1970), and cases therein cited.

■ But even if the pre-trial confrontations were deficient, the in-court identifications may be found capable of standing on their own feet. In making such a determination, the key role is that of the trial judge who heard the witnesses and observed their demeanor, and it ought not be overlooked. Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968).

Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), presented an entirely different situation. In that case the Court said:

"Except for the robbers themselves, the only witness to the crime was Joseph David, the late-night manager of the Western Union office. After Foster had been arrested, David was called to the police station to view a lineup. There were three men in the lineup. One was petitioner. He is a tall man—close to six feet in height. The other two men were short—five feet, five or six inches. Petitioner wore a leather jacket which David said was similar to the one he had seen underneath the coveralls worn by the robber. After seeing this lineup, David could not positively identify petitioner as the robber. He 'thought' he was the man, but he was not sure. David then asked to speak to petitioner and petitioner was brought into an office and sat across from David at a table. Except for prosecuting officials there was no one else in the room. Even after this one-to-one confrontation David still was uncertain whether petitioner was one of the robbers: 'truthfully—I was not sure,' he testified at trial. A week or 10 days, later, the police arranged for David to view a second lineup. There were five men in that lineup. Petitioner was the only person in the second lineup who had appeared in the first lineup. This time David was 'convinced' petitioner was the man." (Id. at 441–442, 89 S.Ct. at 1128)

The Court further said:

"The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact 'the man'. In effect, the police repeatedly said to the witness, 'This is the man.' See Biggers v. Tennessee, 390 U.S. 404, 407, 88 S.Ct. 979, 19 L.Ed.2d 1267 (dissenting opinion). This procedure so undermined the reliability of the eyewitness identification as to violate due process." (Id. at 443, 89 S.Ct. at 1129)

No such suggestive elements existed here.

In the present case we have positive identification by not one but by four witnesses of not only the defendant but also of his station wagon.

The judgment of the District Court will be reversed and the cause remanded with instructions to deny the application for a writ of habeas corpus.