**UNITED STATES of America,**
**Appellant,**

v.

**Macio SINGLETON.**

**Nos. 81–1810, 81–1827.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 8, 1982.

Decided March 15, 1983.

---

J. Alvin Stout, III, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, and John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellant.

Ed Wilhite, Washington, D.C. (appointed by this court), for appellee.

Before WRIGHT and TAMM, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the court filed by Circuit Judge TAMM.

Opinion dissenting in No. 81–1810 and concurring in No. 81–1827 filed by Circuit Judge J. SKELLY WRIGHT.

TAMM, Circuit Judge:

In these consolidated appeals we are called upon first to review the evidence presented in an armed robbery trial to determine whether the district court erred in granting a judgment of acquittal after a jury found appellee guilty.[1] Second, we must decide whether an indictment charging appellee with failure to appear for arraignment was properly dismissed by the

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. The per curiam opinion issued today in this case and in *USA v. Campbell* reflects the position of the *en banc* court in cases involving these legal problems. 702 F.2d 1182. Our opinion in this case was decided in accord with the principles stated in the per curiam.

district court. In the first case, No. 81–1810, because there was sufficient evidence upon which the jury could find appellee guilty beyond a reasonable doubt, we vacate the judgment of acquittal and remand with directions to reinstate the jury verdicts. In the second case, No. 81–1827, we hold that the indictment was properly dismissed as time-barred. The indictment was filed outside the five-year statutory period, and the Government failed to prove that the statute of limitations was tolled by appellee's fugitive status.

## I. Background

On the evening of September 8, 1975, a Gino's fast food restaurant on the corner of Florida Avenue and North Capitol Street in Northeast Washington, D.C., was robbed by two men, one of whom brandished a sawed-off shotgun taken from a zippered bag. Moments after the robbery, appellee Macio Singleton was stopped approximately twenty-five yards from the door of the restaurant. He was taken to Gino's for identification, and three of four counterwomen on duty positively identified him as the man who had wielded the gun during the robbery.

In October 1975, Singleton was indicted on four counts of armed robbery,[2] one count of possession of an unregistered firearm,[3] and one count of possession of a firearm not identified by a serial number.[4] Singleton did not appear for arraignment and was not rearrested until February 1981. In April 1981, a separate indictment was filed charging him with one count of failure to appear, a Bail Reform Act violation.[5]

The trial judge declined to consolidate the Bail Reform Act and the armed robbery cases, and appellee was tried on the latter charges in late April. After the jury returned verdicts of guilty on all counts, the district court granted Singleton's motion for judgment of acquittal on the ground that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt.[6] At the same time, the district court granted appellee's motion to dismiss the Bail Reform Act charge as barred by the statute of limitations. The Government noted appeals from both rulings, and the appeals were consolidated before this court.

On appeal, the Government argues that the district court misapplied the standard for determining whether to grant a judgment of acquittal and submits that the evidence adduced at trial was more than sufficient to support the jury's verdicts. The Government also contends that the district court erred in dismissing the Bail Reform Act charge as untimely. Singleton was a fugitive from justice, it is argued, and therefore not entitled to the benefit of the statute of limitations.

## II. No. 81–1810

### A.

■ At the outset, we must consider whether we have jurisdiction to hear this appeal. Although the Supreme Court has never addressed the precise jurisdictional issue presented here, we believe that its decisions construing the Criminal Appeals Act of 1970, 18 U.S.C. § 3731 (1976),[7] and the Double Jeopardy Clause of the Fifth Amendment make it clear that post-verdict judgments of acquittal based on insufficiency of the evidence may be appealed. At least eight other circuits have addressed this issue, and all have reached the same conclusion.[8]

---

2. 22 D.C.Code Ann. §§ 2901, 3202 (1981).

3. 26 U.S.C. § 5861(d) (1976).

4. *Id.* § 5861(i).

5. 18 U.S.C. § 3150 (1976).

6. The motion was made and granted pursuant to Fed.R.Crim.P. 29(c).

7. 18 U.S.C. § 3731 (1976) provides that in criminal cases the Government may appeal "from a

decision, judgment, or order of a district court dismissing an indictment or information ... except where the double jeopardy clause of the United States Constitution prohibits further prosecution."

8. *See United States v. Steed,* 674 F.2d 284, 286 (4th Cir.1982) (en banc); *United States v. Burns,* 597 F.2d 939, 940 (5th Cir.1979); *United States v. Blasco,* 581 F.2d 681, 683 (7th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. Jones,* 580

The Supreme Court has held that in enacting section 3731, "Congress intended to remove all statutory barriers to Government appeals, and to allow appeals whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975). In *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), the Court stated that "the Double Jeopardy Clause does not bar a Government appeal from a ruling in favor of the defendant after a guilty verdict has been entered by the trier of fact." *Id.* at 130, 101 S.Ct. at 434.[9] The Double Jeopardy Clause prohibits Government appeals only where there is a danger of subjecting the defendant to a second trial for the same offense. *See United States v. Jenkins,* 420 U.S. 358, 365, 95 S.Ct. 1006, 1010, 43 L.Ed.2d 250 (1975); [10] *Wilson,* 420 U.S. at 352–53, 95 S.Ct. at 1026. Reversal of a post-verdict judgment of acquittal based on insufficiency of evidence would result in reinstatement of the jury verdict without placing defendant/appellee in jeopardy again. Thus, we hold that the Government may appeal, pursuant to section 3731, a post-verdict judgment of acquittal based on insufficiency of the evidence.

■ Having decided that the Government's appeal is properly before this court, we must determine the applicable standard of review. Until now, our review of district court rulings on sufficiency of evidence has been in the context of appeals from the *denial* of motions for judgments of acquittal. In such cases, the standard for appellate review is the same as that employed by the trial judge in passing on the motion. *See Burks v. United States,* 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d

F.2d 219, 221–22 n. 3 (6th Cir.1978); *United States v. Calloway,* 562 F.2d 615, 616–17 (10th Cir.1977); *United States v. Cahalane,* 560 F.2d 601, 603 n. 2 (3d Cir.1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *United States v. Rojas,* 554 F.2d 938, 941 (9th Cir.1977); *United States v. De Garces,* 518 F.2d 1156, 1159 (2d Cir.1975).

**9.** In illustrating this point, the Court referred to two cases that hold that the Government can appeal post-verdict judgments of acquittal based on insufficiency of the evidence. *See United States v. DiFrancesco,* 449 U.S. 117, 130, 101 S.Ct. 426, 433, 43 L.Ed.2d 232 (1980) (citing *United States v. Rojas,* 554 F.2d 938, 941 (9th Cir.1977), and *United States v. De Garces,* 518 F.2d 1156, 1159 (2d Cir.1975)).

The dissent suggests that *DiFrancesco* lends no support to our holding that jurisdiction exists in this case because it involved Government appeal of *sentences,* and the Court there went to great lengths to distinguish acquittals from sentences. *See* dissenting opinion (dis. op.) at 1172 n. 8. All of the cases relied upon by the Supreme Court in making this distinction, however, were cases where a successful appeal would have necessitated a second trial. *See, e.g., Fong Foo v. United States,* 369 U.S. 141, 82 S.Ct. 671, 671, 7 L.Ed.2d 629 (1962); *Kepner v. United States,* 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904). A careful reading of *DiFrancesco* and other recent Supreme Court cases in the Double Jeopardy area reveals that the Court's primary concern lies with denying the Government successive opportunities to convict a defendant. *See, e.g., DiFrancesco,* 449 U.S. at 132, 101 S.Ct. at 434 ("[T]he prohibition against multiple trials is the 'controlling constitutional principle.'"); *id.* at 136, 101 S.Ct. at 437 ("The double jeopardy considerations that bar reprosecution after an acquittal do not prohibit review of a sentence.... [T]he basic design of the double jeopardy provision ... is[ ] as a bar against repeated attempts to convict ...."). *See also United States v. Scott,* 437 U.S. 82, 90, 91, 98 S.Ct. 2187, 2193, 2194, 57 L.Ed.2d 65 (1978); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 570, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977); *United States v. Jenkins,* 420 U.S. 358, 365, 369, 370, 95 S.Ct. 1006, 1010, 1012, 1013, 43 L.Ed.2d 250 (1975). Just as these considerations have "no significant application" in the context of appellate review of a sentence, *DiFrancesco,* 449 U.S. at 136, 101 S.Ct. at 437, they are inapplicable in the instant circumstances where, as noted *infra* in text, the jury verdict can be reinstated upon remand and there is no threat of the type of governmental oppression against which the Double Jeopardy Clause is designed to protect.

**10.** In *Jenkins* the Court assumed that a judgment of acquittal granted after a jury verdict of guilty could be appealed, since no retrial would be required. 420 U.S. at 365, 95 S.Ct. at 1010. Later, in *Scott,* the Court quoted extensively from this section of *Jenkins* and stated that "[d]espite the ... heavy emphasis on the finality of an acquittal in Martin Linen [and *Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) ], neither decision explicitly repudiates" the assumption in *Jenkins* "that a judgment of acquittal may be appealed where no retrial would be needed on remand." 437 U.S. at 91 n. 7, 98 S.Ct. at 2194 n. 7.

1 (1978); *United States v. Foster,* 584 F.2d 997, 1000 (D.C.Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 620, 58 L.Ed.2d 682 (1978). Thus, the proper inquiry in reviewing denials of motions for judgments of acquittal is whether, viewing the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury *must necessarily* entertain a reasonable doubt on the evidence presented. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Curley v. United States,* 160 F.2d 229, 232 (D.C. Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). "If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make." *Curley,* 160 F.2d at 237.[11] We hold that this standard of review is equally applicable on appeal from the *grant* of a motion for judgment of acquittal.[12] All other circuits that have had occasion to review the grant of a post-verdict judgment of acquittal have also applied the traditional standard for reviewing the sufficiency of evidence.[13]

In *United States v. Steed,* 646 F.2d 136 (4th Cir.1981), a panel in the Fourth Circuit held that on the Government's appeal from a post-verdict judgment of acquittal, the court of appeals must defer to the district court's assessment of the evidence. *Id.* at 142. This decision was resoundingly rejected by the Fourth Circuit sitting en banc.

*United States v. Steed,* 674 F.2d 284 (4th Cir.1982) (en banc). Judge Butzner, writing for the court, stated that "[w]hether the assessment of the evidence is at the behest of the government or the defendant, the function of the reviewing court is unchanged and consequently the same standard of review is appropriate." *Id.* at 286. We agree. We have a responsibility to ensure that the Government's right to appeal is not an empty one; we must conduct our review of Government appeals with the same care afforded appeals by defendants.

### B.

We have reviewed with considerable care the fifteen-volume transcript in this case, and we are convinced that, viewing the evidence in the light most favorable to the Government, there is sufficient evidence in the record to support the jury's verdicts of guilty. The evidence that supports the jury's verdicts will be summarized briefly.

The trial testimony shows that on the evening of September 8, 1975, Officer John Betts [14] and his partner, Officer Joyce Willis Hardy, were in a marked cruiser stopped in traffic on Florida Avenue directly in front of Gino's. Betts saw two black men exiting the restaurant and heading toward the officers. When they spotted the squad car, however, the men began to run the other way. Betts, an experienced officer familiar with the high crime nature of the neighborhood, suspected that Gino's had been robbed and instructed Officer Hardy to give chase

---

**11.** *See also United States v. Johnson,* 589 F.2d 716, 720 (D.C.Cir.1978) (accused entitled to judgment of acquittal only when there is no evidence upon which reasonable minds might fairly conclude guilt beyond a reasonable doubt).

**12.** The dissent suggests that the standard of review we adopt today may encourage district judges to pass on motions for judgments of acquittal before a jury has returned its verdict in order to preclude review by this court. Dis. op. at 1172. We agree that where all the evidence has been presented, trial courts should reserve judgment on motions for acquittal until after return of the jury verdict, but we are unwilling to assume that the decisions of district judges in this regard will be more influ-

enced by the desire to avoid appellate review than by the desire to take "the maximum opportunity to consider with care a pending acquittal motion." *Id.*

**13.** *See, e.g., United States v. Dixon,* 658 F.2d 181, 188 (3d Cir.1981); *United States v. Burns,* 597 F.2d 939 (5th Cir.1979); *United States v. Blasco,* 581 F.2d 681 (7th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. Calloway,* 562 F.2d 615 (10th Cir.1977); *United States v. Rojas,* 554 F.2d 938 (9th Cir.1977); *United States v. De Garces,* 518 F.2d 1156 (2d Cir.1975).

**14.** By the time of the trial, Officer Betts had been promoted to Detective.

by foot. As Officer Hardy chased the two suspects through Gino's parking lot, one of the men turned left toward North Capitol Street, and the second continued straight ahead and entered an alley. Hardy pursued the second man but lost sight of him in the alley.

Betts drove around the corner onto North Capitol Street in an effort to cut the suspects off. No more than ten seconds after he initially observed the men leaving Gino's, and only about twenty or twenty-five yards away from the door of the restaurant, Betts observed a black male wearing the same apparel as one of the men he had seen leaving Gino's.[15] The suspect, later identified as Singleton, had been walking at a fast pace, but slowed to a normal gait when he noticed the police car. Betts approached the suspect and advised him of an apparent robbery at Gino's. Meanwhile, Officer Hardy came out of the alley and saw her partner approximately thirty feet away with Singleton. While walking toward them, she recovered a gym bag containing a sawed-off shotgun.

Singleton was taken immediately to Gino's for a showup, and three of the four counterwomen present when the robbery was committed positively identified him as the man with the gun. Testimony regarding these identifications was the keystone of the Government's case against appellee. Brenda Hardy, one of the counterwomen, testified that the robber with the gun was in her sight for about two minutes at a distance of three to four feet, and that although she was primarily staring at his gun, she could still glance up at him. When the police brought Singleton into Gino's, she identified him as the man with the gun. Ms. Hardy told the jury that she was "very positive" of her identification, that on her way to work about two days after the rob-

bery she saw the man again,[16] and that she "never forgot how he looked." Trial Transcript (Tr.) at 29–32.

Ruth Taylor, another counterwoman, testified that she recognized Singleton as soon as the police brought him through the door of Gino's, even before she was asked to identify him. Although she glanced at the robber's face only once, Ms. Taylor was sure at the time of her identification that appellee was the man with the gun.[17]

Lutherina Baptist, yet another counterwoman at Gino's, told the jury that at one point she looked directly at the man with the gun, who was within an arm's length of her. When the police brought the suspect into the restaurant, she was "more than positive" that he was the same man because the incident was "fresh in [her] mind" and "his face was implanted on [her] mind." Tr. at 123–24. The fourth counterwoman to testify, Catherine Allen, was so frightened by the robbery that she was unable to recall whether she was even asked by police to identify appellee.

Arguing that the district court correctly ruled that this evidence was insufficient to support the jury's guilty verdicts, appellee contends that there was a broad divergence between the witnesses' recollections of the robber's appearance and Singleton's appearance on the evening of the robbery. Government Exhibit Number Four, a photograph taken at the police station after his arrest, shows Singleton with a beard, mustache, and bushy hair. The apparel worn by appellee in the photograph consisted of a dark zippered jacket with jagged cut-off sleeves, light brown pants and white tennis shoes.

At trial, Brenda Hardy recalled that the robber wore a short or medium bush hairstyle, a goatee, and perhaps a mustache.

---

15. Detective Betts testified that he did not recognize this individual on the basis of facial features. Trial Transcript (Tr.) at 205. Betts also stated that when he first saw the men exiting Gino's, the suspect he later apprehended had been carrying a valise or large tote bag. Tr. at 202–03.

16. On cross-examination Ms. Hardy stated that she saw the man twice after the robbery. Tr. at 55.

17. In a bit of contradictory testimony, Ms. Taylor stated, "Well, I didn't really glance up at him. I didn't take a glance at his face that good." Tr. at 67.

She testified that he was dressed in blue jeans and a green jacket with long sleeves buttoned at the wrist. Ms. Baptist stated that although "it was a long time ago," Tr. at 114, and she didn't remember exactly what the man with the gun looked like, he had no beard, but might have had a mustache. Ms. Baptist had no recollection of the robber's clothing.

Ms. Taylor recalled that the man with the gun had bushy hair. She stated that his face was "kind of clean," Tr. at 70, and that, although he may have had a mustache, he did not have a beard. According to Ms. Taylor, the robber with the gun was wearing an open, faded jean jacket with long sleeves and an orange knitted cap. Ms. Taylor stated that her identification at Gino's was based, at least in part, on her recollection of the robber's clothing. Looking at Government Exhibit Number Four, she testified that she was positive that the clothes shown in the photograph were not the clothes the man with the gun had on at the time of the robbery.

Officer Betts testified that the man he saw leaving Gino's and later apprehended was wearing a dark jacket and dark pants, and that he had noticed no color distinction between them. Betts also stated that Government Exhibit Number Four accurately represented the clothing Singleton was wearing when he was apprehended. On cross-examination, however, Betts admitted that a distinct difference between the color of Singleton's pants and jacket is evident from the photograph.

### C.

In a Supplemental Memorandum and Order filed on September 3, 1981, the district judge expressed his concern regarding the suggestive nature of the showup conducted at Gino's [18] and emphasized that the independent recollections of the witnesses substantially contradicted the showup identification. In his view, these factors, considered together, reduced the weight of the identification evidence to the point where the jurors *must* have had a reasonable doubt as to the identification of the robber with the gun.[19] Thus, the district judge concluded that the judgment of acquittal was required. We disagree.

We share the concern of the trial judge regarding the showup in this case; it was undoubtedly conducted in a highly, perhaps even unnecessarily, suggestive manner.[20] We do not believe, however, that the suggestiveness was a factor which, considered with the conflicting testimony of the witnesses, necessitated or justified a verdict of acquittal. Immediate on-the-

18. The trial judge began the memorandum by stating that this case "is a clear-cut example of the dangerous potential of the one-man 'show-up' for tragic misidentification." United States v. Singleton, Crim. No. 75–721 (D.D.C. Sept. 3, 1981), Supplemental Memorandum and Order at 1; Appellant's Appendix (A.A.) at 25.

19. "[W]here the only government evidence, identifications made in a highly suggestive showup, is flatly contradicted by the independent recollections of the same witnesses, reasonable men and women must have reasonable doubt." *Id.* at 4; A.A. at 28.

20. The witnesses were grouped together during the identification process. The suspect was handcuffed and in police custody. At least one of the counterwomen remembered the police officers' stating that they had a man thought to be one of the robbers and asking for a positive identification. Furthermore, the police never asked the victims for a description of the robbers before the showup, which they certainly could and should have done; nor did they con-

duct a line-up at any time following the showup in order to further clarify the identification.

There is also evidence suggesting that the bag was positioned near the suspect when the victims viewed him, although the gun may not have been visible. Testimony by Ms. Taylor on direct examination indicates that when Singleton was brought into Gino's for identification, the police also had the bag and the gun with them. Tr. at 73. On cross-examination, however, Ms. Taylor stated that she never saw the bag after the robbery and that she did not know whether or not the police had the bag with them when they brought Singleton into Gino's. *Id.* at 87–88. She was not asked about the gun on cross-examination. Ms. Baptist testified that she did not see the gun until *after* she had made her identification. *Id.* at 127–28. Singleton himself testified that although the bag was beside him during the showup, it was zipped up and the gun was not visible to him or to those attempting to identify him. *Id.* at 388.

scene showup identifications, while recognized as inherently suggestive, have long been upheld by this court. *See, e.g., Russell v. United States,* 408 F.2d 1280, 1284 (D.C. Cir.), *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); *Wise v. United States,* 383 F.2d 206, 208 (D.C.Cir.1967), *cert. denied,* 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968). "Balancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations . . . will 'if anything promote fairness by assuring reliability . . . .' " *Russell,* 408 F.2d at 1284 (quoting *Wise,* 383 F.2d at 209). Notwithstanding its suggestive elements, the showup at issue here took place under circumstances that would tend to promote reliability.[21] The showup took place within two or three minutes after the robbery, at the scene of the crime. The witnesses had ample opportunity to view the culprits at close range in good lighting conditions.[22] In addition, the witnesses were quite certain of their identifications.

■ Once admitted, identification evidence is for the jury to weigh.[23] Suggestive procedures often vitiate the weight of the evidence, and the jury may tend to discount the resulting identification. *Manson v. Brathwaite,* 432 U.S. 98, 112 n. 12, 97 S.Ct. 2243, 2252 n. 12, 53 L.Ed.2d 140 (1977). The suggestiveness of the identification procedure used in this case was argued vigorously to the jury in defense counsel's closing argument. Closing Argument Transcript at 46–49. As Justice Blackmun so eloquently stated in *Manson,*

> [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

432 U.S. at 116, 97 S.Ct. at 2253.

■ Nor do we find fatal the incongruence in the testimony of the witnesses. There are variations, to be sure, between the recollections of the witnesses as to the robber's facial appearance and clothing and Singleton's appearance as shown by the photograph taken on the night of his arrest. Such discrepancies are to be expected, however, especially since the witnesses were recalling an event that happened over five years earlier. "It would be a rare case indeed if all the testimony of the prosecution were in perfect harmony." *Government of the Virgin Islands v. Petersen,* 507 F.2d 898, 901 (3d Cir.1975). Again, we note that the weight to be given to the testimony of the witnesses is for the jury to determine. *Sewell v. Cardwell,* 454 F.2d 177, 179

---

21. In *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court held that a defendant could claim that a particular identification procedure had been "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Id.* at 301–02, 87 S.Ct. at 1972. The "central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The Court in *Biggers* noted the factors to be considered in evaluating the likelihood of misidentification:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382. Although *Stovall* and *Biggers* were due process cases, we think the factors enumerated in *Biggers* are relevant in evaluating the weight of identification evidence as well as its admissibility.

22. Ms. Taylor testified that the lighting in Gino's was "about like" that in the courtroom —"not that bright, but it's bright enough . . . to see the customers." Transcript of Motions Hearing (Mar. 30, 1981) 16. Ms. Baptist testified that the lighting was "good," perhaps a little brighter than in the courtroom. *Id.* at 79.

23. The trial judge conducted two days of hearings prior to the denial of Singleton's motion to suppress the evidence of the showup identification on due process grounds. Appellee urges us to review the trial judge's ruling in this regard. Unlike the dissent, however, we decline to reach an issue not properly before us at this time.

(6th Cir.1972). The inconsistencies in testimony were emphasized on cross-examination and argued to the jury in defense counsel's closing arguments.

■ Appellee also complains about the failure of the Government to attempt to elicit an in-court identification. Brief for Appellee at 6. Both before and during trial there was discussion on the issue of whether an in-court identification should be conducted in this case. Neither the Government nor defense counsel thought such an identification advisable in light of the number of years that had passed before trial. Furthermore, pretrial identifications are often more probative than ritualized in-court identifications. *See, e.g., United States v. Hallman,* 439 F.2d 603, 604 (D.C.Cir.1971).[24] This is particularly true when a substantial period of time has elapsed between the out-of-court identification and the trial. *United States v. Higgans,* 507 F.2d 808 (7th Cir.1974).

### D.

■ In sum, we find that the evidence is sufficient to find appellee guilty beyond a reasonable doubt. Three of the four coun-

terwomen on duty at Gino's on the night of the robbery told the jurors they identified Singleton on the evening of September 8, 1975, and each expressed certainty about her identification. In addition, the combined testimony of Officers Betts and Hardy suggested to the jurors that one of the robbers was observed fleeing toward the location where Singleton was stopped, which was also near the spot where the bag with the shotgun was recovered. Finally, appellee elected to testify in his own defense, and the jurors obviously chose to disbelieve his testimony.[25] The judgment of acquittal entered by the district court is, accordingly, vacated.

### III. No. 81–1827

#### A.

The basis for the indictment charging Singleton with violation of the Bail Reform Act, 18 U.S.C. § 3150 (1976),[26] was his failure to appear for arraignment on the armed robbery charges on November 7, 14, and 21 of 1975.[27] The indictment was filed on March 12, 1981, more than three months after the five-year statute of limitations had run. 18 U.S.C. § 3282 (1976).[28] In

---

**24.** In many cases the only identification evidence is testimony of an out-of-court identification. *See, e.g., Rice v. United States,* 437 A.2d 582 (D.C.1981); *Wilkerson v. United States,* 427 A.2d 923 (D.C.), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981); *United States v. Hudson,* 564 F.2d 1377 (9th Cir.1977); *United States v. Bishop,* 534 F.2d 214 (10th Cir.1976).

**25.** Singleton told the jury that at the time he was stopped by Officer Betts he was walking to his mother's house on Channing Street, Northeast. He denied committing the robbery.

**26.** 18 U.S.C. § 3150 provides:
Whoever, having been released pursuant to this chapter, willfully fails to appear before any court or judicial officer as required, shall, subject to the provisions of the Federal Rules of Criminal Procedure, incur a forfeiture of any security which was given or pledged for his release, and, in addition, shall, (1) if he was released in connection with a charge of felony, or while awaiting sentence or pending appeal or certiorari after conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both, or (2) if he was released [i]n connection with

a charge of misdemeanor, be fined not more than the maximum provided for such misdemeanor or imprisoned for not more than one year, or both, or (3) if he was released for appearance as a material witness, shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

**27.** Arraignment was originally scheduled for November 7, 1975. When appellee failed to appear, a bench warrant was ordered and issued. This warrant was returned unexecuted and was quashed on November 10. Arraignment was continued until November 14 and again until November 21. The district court issued a second bench warrant on November 21; it was returned executed on February 18, 1981, when Singleton was rearrested.

**28.** 18 U.S.C. § 3282 provides:
Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.
The Government could have sought an indictment at any time after Singleton failed to ap-

response to appellee's motion to dismiss the indictment as barred by the statute, the Government sought to invoke the tolling provision of 18 U.S.C. § 3290 (1976), which provides that "[n]o statute of limitations shall extend to any person fleeing from justice." A hearing was held on the motion to dismiss on May 5, 1981, and the trial judge granted the motion on June 19, the same day it orally granted the motion for acquittal in Number 81–1810, the armed robbery case. Although the district court gave no reasons for granting the motion to dismiss, our review of the record makes it clear that the Government failed to carry its burden of proving that Singleton was "fleeing from justice."

### B.

At the hearing on the motion to dismiss the Bail Reform Act charge, Singleton testified that when he was originally arrested in 1975, he lived at 1708 5th Street, Northwest, in the District of Columbia, and that his mother lived at 8 Channing Street, Northeast. Bail Transcript (Bail Tr.) at 18, 20.[29] He lived at the same address for some two years after his arrest, and then he moved to a "bigger apartment" located at 76 Randolph Place, Northwest, where he lived at the time of his rearrest in February of 1981. Singleton's mother remained at the Channing Street address for about three years following his arrest. Bail Tr. at 19–20. At the time of his arrest, Singleton worked at the Congressional Country Club, where he continued to work for eighteen months thereafter. Bail Tr. at 20. Singleton testified that at his preliminary hearing on the armed robbery charges he was told he would receive something in the mail

regarding the date of his next court appearance and that he never received such notice. Bail Tr. at 20–21. During the armed robbery trial, Singleton testified that he had heard that the case against a second man charged with the robbery had been dismissed and assumed that the case against him had been dismissed as well. Tr. at 368–69. Appellee also testified that he did not know of any attempts by United States Marshals or police to locate him and that he saw Betts, the arresting officer in the robbery case, on many occasions after his arrest, and the missed court appearances were never mentioned. Bail Tr. at 21–23. Singleton also stated that since his original arrest he had left the District of Columbia only in the course of his employment, for trips into suburban Maryland and Virginia to lay carpet. Bail Tr. at 23–24.

The Government conducted no cross-examination of appellee and presented no evidence contradicting his statements. The Government called Deputy United States Marshal James M. McCarthy as a witness, but he could only testify to several efforts to locate Singleton in 1979.[30] Mr. McCarthy stated that Marshal's Office records indicated that no attempts were made to locate the appellee in 1980 or 1981. Bail Tr. at 44. Since very poor records, or no records at all, were kept prior to 1979, the Deputy Marshal could not testify to attempts to locate Singleton during 1975–1978.[31] Bail Tr. at 53.

### C.

This court has seldom been called upon to construe the language contained in 18 U.S.C. § 3290 and has apparently never

pear for arraignment; it is unclear why they waited until March of 1981 to do so.

29. The designation "Bail Transcript" (Bail Tr.) is used here to refer to the transcript in No. 81–1827. The designation "Tr." will continue to be used in referring to the transcript in No. 81–1810.

30. The testimony indicated that on June 12, 1979, the Marshal's Service attempted to locate appellee at 2225 N Street, Northwest, and at 1708 5th Street, Northwest. On June 13, the Marshals tried to find him at 700 Quincy Street,

Northwest, and 8 Channing Street, Northeast. Bail Tr. at 29–31, 48. There was no indication in the records kept by the Marshals of why they looked for Singleton at these particular addresses or how they determined that he was not on the premises.

31. The Marshal did, however, testify that Singleton's name was placed in the National Crime Information Center computer on November 24, 1975. Bail Tr. at 42.

addressed the question whether one who does not physically flee the jurisdiction can be a fugitive from justice in the sense contemplated by this section.[32]   Other circuits applying section 3290 have held that in order to find that an accused was "fleeing from justice," it is necessary to show he acted with the intent to avoid prosecution or punishment, whether or not he actually left the jurisdiction.   *See, e.g., United States v. Wazney,* 529 F.2d 1287 (9th Cir. 1976); *Jhirad v. Ferrandina,* 486 F.2d 442 (2d Cir.1973); *Donnell v. United States,* 229 F.2d 560 (5th Cir.1956).   The Ninth Circuit in *Wazney* stated that physical absence from the jurisdiction is not required to trigger the tolling provision of section 3290. 529 F.2d at 1289.   "It is enough that an accused leaves his usual place of abode and conceals himself for the purpose of avoiding arrest or prosecution . . . .   In modern large and heavily populated districts it is almost as easy to avoid arrest or prosecution by concealing oneself within the district as by fleeing the district."   *Id.*

We agree that flight from the jurisdiction is not required to trigger the tolling provision.   It would be neither logical nor supportive of the policy underlying section 3290 to interpret the law in such a way that one who leaves and is found without the jurisdiction is "fleeing justice" regardless of his intent, while one who actively evades authorities and conceals himself within the jurisdiction can receive the benefit of the statute of limitations.

The crux of the Government's argument in this case is that by changing his address and failing to maintain contact with his attorney or the court, appellee rendered himself "effectively beyond the reach of justice," thereby triggering the tolling provision of section 3290.[33]   Brief for Appellant at 21.   The Government argued before the district court, and appears to argue here as well, that "one who does not appear as ordered is . . . a fugitive until and unless he, not the Government, can show otherwise."   Bail Tr. at 12.   Proceeding on this assumption, the Government failed to present evidence that Singleton was notified of his court dates, or that efforts were made to locate him within a reasonable period of time after his failure to appear for arraignment.   The Government relied instead upon testimony that the Marshal's Office sought to locate Singleton on two consecutive days during the more than five years prior to his rearrest and on the very fact that Singleton failed to appear in court to prove that he was a fugitive from justice.

We do not believe that failure to make a court appearance in itself necessarily renders one a fugitive from justice.   In a normal case, the facts that Singleton failed to appear, that he did not notify the bail agency of his change of address, and that he failed to maintain contact with his attorney would tend to indicate flight.   This is not, however, a normal case.   More than five years passed between appellee's failure to

---

**32.**  The principal cases in this circuit interpreting the relevant language are *Green v. United States,* 188 F.2d 48 (D.C.Cir.), *cert. denied,* 341 U.S. 955, 71 S.Ct. 1008, 95 L.Ed. 1376 (1951), and *McGowen v. United States,* 105 F.2d 791 (D.C.Cir.), *cert. denied,* 308 U.S. 552, 60 S.Ct. 98, 84 L.Ed. 464 (1939).   These cases, both involving defendants who had left the District of Columbia, suggest that the defendant's intent is irrelevant in determining whether he has fled justice.   "The question is not whether [the defendant] remained out of the District for any particular reason, or at all; it is enough that he did not remain . . . within the District."   *Green,* 188 F.2d at 48 (quoting *McGowen,* 105 F.2d at 792).   In this case, the Government has offered no proof that appellee left the jurisdiction.   It is therefore unnecessary for us to decide whether the rule of law set forth in these early cases—

that mere absence from the jurisdiction is sufficient to toll the statute—retains its vitality today.

**33.**  The Government argues that Singleton bore a special burden because he was obligated, under the terms of his release on personal recognizance, to contact the bail agency and his attorney weekly and to notify the former of any change of address.   "Even if appellee did not have notice of his future court dates, he had the obvious means to obtain them."   Brief for Appellant at 22.   Singleton's failure to fulfill the conditions of his release may merit the imposition of sanctions under the Bail Reform Act but does not, in our view, alone suffice to prove that he was "fleeing justice" for purposes of the tolling provision.

appear in 1975 and his rearrest in 1981. Appellee lived at the same address for two years following his initial arrest and then moved to another apartment. There is no evidence that the Marshal's Office attempted to contact Singleton at any time prior to, or after, June 1979. Furthermore, there is no showing that the Marshals sought to discover Singleton's phone number or new address (*e.g.,* through the Post Office or the phone book) or that they ever tried to locate him at the country club where he worked at the time of his arrest and for eighteen months thereafter.

As the *Wazney* court stated, the accused should not be held responsible for a delay caused by "an open move to a new residence where [he] is readily accessible to *careful* law enforcement officers." 529 F.2d at 1289 (emphasis added). It appears that the Marshal's Service made only minimal efforts to locate Singleton. Therefore, we cannot infer too much from the fact that these efforts proved fruitless. We conclude that on the facts of this case, the Government failed to show that Singleton acted with the intention of avoiding prosecution. The motion to dismiss the indictment under section 3150 was properly granted.

### IV. CONCLUSION

The judgment of the district court in No. 81–1810 is vacated. The case is remanded, and the district court is directed to reinstate the jury's verdicts of guilty, to enter a judgment of conviction, and to impose sentence. The order of the district court in No. 81–1827 dismissing the indictment for failure to appear is affirmed.

*So Ordered.*

J. SKELLY WRIGHT, Circuit Judge, dissenting in No. 81–1810 and concurring in No. 81–1827:

After a jury found appellee guilty of armed robbery, the District Court granted a motion for acquittal. The judge declared it "abundantly clear" that "where the only government evidence, identifications made in a highly suggestive showup, is flatly contradicted by the independent recollections of the same witnesses, reasonable men and women must have reasonable doubt." [1] Based on its own reading of the trial transcript, the majority reaches a different conclusion and vacates the judgment of acquittal ordered by the lower court. Because, in my opinion, the majority misconstrues the standard of review articulated by the *en banc* court in this case and because, in any event, the record amply vindicates the District Court's disposition, I dissent in No. 81–1810.[2]

My disagreement begins with the standard for review adopted by the majority. In my judgment, the majority fails to apply the appropriate principles of appellate review announced today in *United States v. Singleton,* and *United States v. Campbell,* 702 F.2d 1182 (D.C.Cir.1983) (*en banc*) (*per curiam*). Instead, the majority conducts a completely *de novo* review of the record, according no consideration whatever to the lower court's careful assessment of this case. *See* Part I *infra.* Nevertheless, even without considering the District Court's judgment, I would disagree strenuously with the conclusions of the majority. The government based its case on eyewitness identifications made during a showup.[3] The showup, conducted in an extraordinarily suggestive manner, cannot suffice to support a criminal conviction. Indeed, the showup was so suggestive that it constituted a denial of due process. *See* Part II *infra.* There is, however, even *less* to the government's case than simply dubious identifications. Here, the very witnesses who made the identifications testified at trial in ways that fatally undermined the

---

1. *United States v. Singleton,* D.D.C. Criminal No. 75–721 (Sept. 3, 1981), Supplemental Memorandum and Order at 4, *reprinted in* Brief and Appendix for Appellant at 28 (hereinafter Dist. Ct.Op.).

2. I concur in Judge Tamm's disposition in No. 81–1827.

3. *See* text at p. 1173 & nn. 15–16 *infra.*

defendant's alleged guilt. *See* Part III *infra.* Under these circumstances, no reasonable jury could maintain "an abiding conviction, to a moral certainty, of the truth of the charge." [4] Therefore, the District Court should be affirmed.

## I. THE STANDARD OF REVIEW

On July 9, 1982 this same panel issued an opinion in this case, accompanied by my dissent. By order of October 4, 1982 the full court vacated the panel's judgment and opinion and granted rehearing *en banc* of the case. The *en banc* court limited its consideration of the case to a determination of the following issue:

What degree of deference, if any, is due to a district court's assessment of the sufficiency of the evidence in granting a post-verdict motion for acquittal?

In its *per curiam* decision, the full court determined that while we must reach our own independent judgment on the sufficiency of the evidence, *"we may consider and be influenced by the opinion of the expert trial judge who has lived with the case—just as we give weight to one another's views." United States v. Singleton, supra,* 702 F.2d at 1183 (emphasis added). Such consideration is particularly appropriate when the trial judge, as here, has stated his reasoning with specificity. *Id.*

The panel majority has completely disregarded the full court's admonition to accord serious consideration to the District Court's assessment of the evidence. The District Court, after assessing the sufficiency of the evidence in this case, concluded that a reasonable jury must have a reasonable doubt. The court therefore granted a motion for acquittal after the jury had returned a guilty verdict. In reviewing such determinations under the Criminal Appeals Act of 1970,[5] the majority holds that an appellate court should conduct *de novo* precisely the same inquiry as the District Judge.[6] In so doing, the majority completely ignores the conclusion reached by the trial judge. Such an approach contravenes not only the plain language of the *en banc* court's decision in this case, but the important principles that demand serious appellate consideration of the trial court's assessment of the evidence.[7]

To begin with, the Supreme Court has stressed the "constitutional significance" of a District Court's determination that the government's evidence was legally insufficient to sustain a conviction. *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 572, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977). *See, e.g., Sanabria v. United States,* 437 U.S. 54, 68–69, 98 S.Ct. 2170, 2180–81, 57 L.Ed.2d 43 (1978). Such a ruling "relate[s] to 'the ultimate question of guilt or innocence,'" *United States v. Scott,* 437 U.S. 82, 98 n. 11, 98 S.Ct. 2187, 2197 n. 11, 57 L.Ed.2d 65 (1978) (*quoting Stone v. Powell,* 428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976)), and can "'establish the criminal defendant's lack of criminal culpability' * * *." *United States v. Scott, supra,* 437 U.S. at 98, 98 S.Ct. at 2197 (majority opinion *quoting id.* at 106, 98 S.Ct. at 2201 (Brennan, J., dissenting)). *Cf. Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978) (distinguishing reversal for evidentiary insufficiency as opposed to trial error in terms of implications for guilt or innocence). Furthermore, determinations of the sufficiency

---

4. J. WIGMORE, EVIDENCE § 2497 at 406 (Chadbourn rev. 1981) (*quoting Commonwealth v. Webster,* 59 Mass. (5 Cush.) 295, 320 (1850) (Shaw, C.J.)) (defining proof beyond a reasonable doubt).

5. 18 U.S.C. § 3731 (1976). This is the first time that this court has addressed the standard for review of post-verdict grants of acquittal.

6. *See* majority opinion (maj. op.) at 1162 (adopting same standard for appellate review as that employed by trial judge); *id.* at 1167 ("In sum, we find that the evidence is sufficient to find

appellee guilty beyond a reasonable doubt.") (inquiry identical to that conducted by the District Court).

7. According serious consideration to the District Court's assessment does not intimate any lack of respect for the jury. When a trial judge grants a motion for acquittal based on insufficiency of the evidence, he has found that the case should never have been submitted to the jury. *See United States v. Burks,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978).

of the evidence can allow the trial judge to perform an important "protective" role. *See* 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3939 at 345 (1981 Pocket Part). *Cf. United States v. Martin Linen Supply Co., supra,* 430 U.S. at 574–575, 97 S.Ct. at 1356 (determinations of evidentiary sufficiency may protect a defendant by filtering out deficient prosecutions). These considerations should not preclude appeals from post-verdict grants of acquittal,[8] but appellate courts should only reluctantly overturn such a weighty ruling.

Powerful practical considerations also suggest the need for according serious consideration to the District Court's determination. A grant of acquittal by a trial judge *prior* to a jury verdict is final and not reviewable even if based on an "egregiously erroneous foundation." *Fung Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962). By contrast, post-verdict grants of acquittal are not merely reviewable but, under the majority's approach, the District Court's determination receives no consideration at all. Faced with a choice between a non-reviewable pre-verdict grant of acquittal and a post-verdict grant that will be utterly ignored, a District Judge may opt for the former.

This result would be extremely unfortunate. Not only would it preclude review even where the lower court has seriously erred, it also would not afford a trial judge the maximum opportunity to consider with care a pending acquittal motion.[9] Where all the evidence has been presented, District Judges should be encouraged to pass on motions for acquittal *after* a jury has returned its verdict.[10] Refusal to accord lower courts any consideration at all can only tend to discourage this better practice.

Most crucially, a District Court's judgment that the evidence cannot suffice to support a conviction should significantly influence the appellate court's determination because the trial judge is in a far better position to make such assessments. The trial judge has a fresh personal knowledge of the evidence given and the witness' testimony. He has a "superior opportunity to get 'the feel of the case' * * *." *Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 71 (2d Cir.1967) (Friendly, J.). *See Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947). A typewritten transcript available to a reviewing court can never completely convey the full import of the facts and circumstances adduced at trial. Appellate courts

**8.** I agree that the court has jurisdiction to hear this appeal. In my view, however, the majority errs when it attempts to extract this holding from Supreme Court cases. For instance, *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), quoted in maj. op. at 1162, held that an appellate court has jurisdiction over government appeals from *sentences* under 18 U.S.C. § 3576 (1976). The Court took great pains to distinguish acquittals from sentences. *See, e.g.,* 449 U.S. at 134, 101 S.Ct. at 436 ("This Court's decisions in the sentencing area clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal."); *id.* at 133, 101 S.Ct. at 435 (emphasizing a number of "fundamental distinctions between a sentence and an acquittal"); *id.* at 137–138, 101 S.Ct. at 137–138 (stressing the "critical difference between an acquittal and a sentence").

In *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Court did hold that the government could appeal a judgment of acquittal that rests on a ruling of law after a jury has returned a guilty verdict.

However, the Court has never addressed the appealability of acquittals resting on an evaluation of the evidence. *But see* 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3919 at 352 (1981 Pocket Part) (concluding, after an exhaustive analysis of Supreme Court precedents, that "[i]t is now doubtful whether the government can appeal a fact-based judgment of acquittal entered after a jury has returned a guilty verdict * * *.").

**9.** This policy is incorporated in Fed.R.Crim.P. 29. *See United States v. Martin Linen Supply Co.,* 430 U.S. 564, 574, 97 S.Ct. 1349, 1356, 51 L.Ed.2d 642 (1977).

**10.** *Cf.* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2533 at 586 (1971) (discussing civil.practice). While the considerations differ in the criminal context, there nonetheless exists an important interest in allowing a jury the opportunity to vindicate an accused even when the trial judge is convinced that acquittal is required.

are well equipped to make rulings of law, but here the legal ruling is intimately tied to a knowledge of the trial evidence. This constitutes a "sound and proper reason for conferring a substantial measure of respect to the trial judge's ruling * * *." Rosenberg, *Appellate Review of Trial Court Discretion,* 79 F.R.D. 173, 183 (1979).

Finally, the District Court's judgment in this case is "particularly" worthy of serious consideration because the trial judge "has set forth his reasons with specificity." *United States v. Singleton, supra,* 702 F.2d at 1183. By detailing the numerous contradictions between the witnesses' identifications in the highly suggestive showup and their subsequent independent recollections of the criminal events,[11] the trial judge has provided the specificity of explanation that certainly should influence the reviewing court's ultimate determination.

Thus, in my judgment, the majority errs by failing to follow the *en banc* court's decision that in deciding this case, this court should "consider and be influenced by" the District Judge's assessment of the sufficiency of the evidence.[12] After all, it is he who was "the expert trial judge who has lived with the case[.]" *United States v. Single-*

ton, *supra,* 702 F.2d at 1183. Even without any consideration of the District Court's judgment, however, it is clear from the record that the District Court's order of acquittal should be affirmed.

## II. THE DEFECTIVE SHOWUP

On the night of his 29th birthday,[13] Macio Singleton was walking in the general direction of his mother's house[14] when he was stopped by a policeman. He was taken to a nearby Gino's carry-out restaurant that had just been robbed by two men, one of whom had held a sawed-off shotgun taken from a zippered bag. At the restaurant three of the four counterwomen on duty identified Mr. Singleton as the man who had held the shotgun. These identifications constituted the *sine qua non* of the government's case.[15] *See* maj. op. at 1164 ("Testimony regarding these identifications was the *keystone* of the Government's case against appellee.") (emphasis added).[16]

When the government's entire case rests on showup identifications, the circumstances surrounding the pretrial confrontation assume special significance. Here, the District Judge wondered "[w]hether extrajudicial identifications comparable to those in

**11.** Dist.Ct.Op., *supra* note 1, at 1–3.

**12.** The majority disparages the panel opinion in *United States v. Steed,* 646 F.2d 136 (4th Cir. 1981), *rev'd en banc,* 674 F.2d 284 (4th Cir. 1982). In so doing the court attacks a straw man. The panel in *Steed* employed a "standard of *absolute* deference," 646 F.2d at 140 (emphasis added), a position not endorsed by this circuit. Nor is there any suggestion that the government's right to appeal be made "an empty one." Maj. op. at 1163.

**13.** The crime occurred on September 8, 1975. Maj. op. at 1161. Mr. Singleton was born on September 8, 1946. *See* Criminal Docket Sheet, D.D.C. Criminal No. 75–721, at 1.

**14.** His mother's address was 8 Channing Street, N.E. *See* Brief and Appendix for Appellant at 9. This address is north of Gino's, the direction in which appellee was walking when arrested.

**15.** Dist.Ct.Op., *supra* note 1, at 4 (identification amounted to "only government evidence").

**16.** In summarizing the evidence, maj. op. at 1167, the majority also notes that appellee testified in his own defense but that the jurors must have disbelieved his testimony. *Id.* However, no one would seriously suggest that disbelief in the denial of guilt constitutes actual proof of guilt. *See Cephus v. United States,* 324 F.2d 893, 895 (D.C.Cir.1963) (prosecution must establish *prima facie* case before defendant may be put to defense). The majority also points to the testimony of Officers Betts and Hardy, but this testimony merely "suggested to the jurors that one of the robbers was observed to flee toward the location where Singleton was stopped * * *." Maj. op. at 1167. This hardly amounts to proof of criminal activity. Besides, Officer Hardy had no recollection of the suspect who fled in that direction, Trial Transcript (Tr.) 176, and she did not see the faces of either robber, *id.* 156. Officer Betts did not pursue the suspects; the man he saw leaving Gino's wore dark pants, *id.* 200, while Mr. Singleton wore light tan pants, Gov't Exhibit No. 4; and he made no facial recognition of Mr. Singleton as the suspect leaving Gino's, Tr. 205.

this case, standing alone, would suffice to support a criminal conviction * * *."[17] I share the District Court's concern. Indeed, under the totality of the circumstances, the showup in this case was so suggestive as to pose a very substantial likelihood of misidentification. Therefore, the showup violated due process, and testimony based on it should never have been admitted.[18] *See Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (standard for admissibility is whether a very substantial likelihood of misidentification exists). Because, in my judgment, the showup violated due process, it necessarily follows that identifications based on the showup cannot suffice to support a criminal conviction.[19]

In deciding whether a pretrial identification violates due process, a court must balance "the corrupting effect of the suggestive identification itself" against indicia of reliability of the identification. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). In this case the corrupting effect of an extraordinarily suggestive identification exists. Meanwhile, countervailing indicia of reliability are either nonexistent or relatively insignificant.

### A. Extraordinarily Suggestive Aspects of the Identification

The majority admits that the showup in this case "was undoubtedly conducted in a highly, perhaps even unnecessarily, suggestive manner." Maj. op. at 1165. The court attempts to minimize the significance of this concession by noting that all showup identifications are "inherently suggestive." *Id.* at 1165–1166. However, the fact that showup identifications are inherently suggestive does not immunize all such identifications. While approving the use of showups in general, our court has never approved and has always distinguished showups that take place under "unusually suggestive" circumstances. *Russell v. United States,* 408 F.2d 1280, 1284 (D.C.Cir.), cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). *See Wise v. United States,* 383 F.2d 206, 210 (D.C.Cir.1967), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968) (noting that no aspects of the particular identification in that case diverged from "rudimentary fairness").

Indeed, because showup identifications are by their nature suggestive,[20] it is imperative that police officers avoid introducing needless additional elements of suggestiveness.[21] Yet in this case the police signifi-

17. Dist.Ct.Op., *supra* note 1, at 4. The District Court did not resolve this issue since there was the added presence of conflicting independent testimony from the identifying witnesses. *See* Part III *infra.*

18. The majority states that it declines to address the due process issue. Maj. op. at 1166 n. 23. However, the court adopts an analysis of the showup testimony identical to that used in due process cases, *see, e.g., id.* at 1165–1166 & n. 21, and *all* of the cases relied upon by the court in its analysis are due process cases, *see id.* at 1165–1166 (*citing Russell v. United States,* 408 F.2d 1280, 1284 (D.C.Cir.), cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); *Wise v. United States,* 383 F.2d 206, 208 (D.C.Cir.1967), cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968)); maj. op. at 1166 n. 21 (*citing Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Moreover, because it finds the showup testimony sufficient to allow a reasonable jury to convict, the majority's analysis tends to foreclose a due process claim. Otherwise, how could evidence

be substantial enough to allow a reasonable jury to convict and yet be so unreliable as to be inadmissible on due process grounds?

Nonetheless, the majority clearly leaves open a subsequent appeal by Mr. Singleton raising the due process issue. When such an appeal is brought, the court will have to face the issue directly. In my opinion, admission of such testimony violated due process, so that *a fortiori* the identification testimony cannot suffice to allow a reasonable jury to convict.

19. *See* note 18 *supra.*

20. *See Russell v. United States, supra* note 18, 408 F.2d at 1284. Here, the suspect was "handcuffed and in police custody" at the showup. Maj. op. at 1165 n. 20.

21. *See* 4 J. WIGMORE, EVIDENCE § 1130 at 293 (Chadbourn rev. 1972) ("The cruel injustices that have been done by mistaken testimony to recognition of an accused person call * * * for extra caution in using all testimony of the kind, and in particular for an overhauling of the methods used by police officials in confronting the accused with the victim.").

cantly aggravated the situation by actions that needlessly and unmistakably suggested defendant's guilt.

1. Placement of incriminating physical evidence next to defendant at the showup.

When Mr. Singleton was brought to Gino's for identification, the police placed near him the zippered bag,[22] and also apparently the shotgun,[23] that had been used in the robbery. These items were *not* in Singleton's possession when he was arrested by Officer Betts; the government concedes that "appellee was not carrying anything when stopped * * *."[24] Rather, they were found separately by Officer Hardy after she had lost sight of the robbers.[25]

The three identifying witnesses had all seen the bag during the holdup; one of them had even "focused" her attention on it.[26] Similarly, the shotgun hardly escaped their notice.[27] By placing physical evidence near the defendant, the police substantially increased the risk that the identification would be the product *not* of spontaneous and independent judgment, but rather of

insinuation. The identifying witnesses would inevitably tend to infer guilt based on their positive identification of the physical evidence as opposed to recognition of Mr. Singleton himself.[28] Also, the chosen procedure obviously suggested that Mr. Singleton had been captured in possession of the physical evidence, which was simply untrue.

In evaluating the suggestiveness of an identification for due process purposes, one of the key factors that courts in this circuit have explicitly identified is whether "any tangible objects related to the offense [were] placed before the witness that would encourage identification." *United States v. Neverson,* 463 F.2d 1224, 1230 n. 7 (D.C.Cir. 1972); *Clemons v. United States,* 408 F.2d 1230, 1245 n. 16 (D.C.Cir.1968) (*en banc*), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), *aff'g United States v. Clark,* 294 F.Supp. 44, 49–50 (D.D.C.1968); *United States v. O'Connor,* 282 F.Supp. 963, 965 (D.D.C.1968), *aff'd,* 420 F.2d 644 (D.C. Cir.1969) (*per curiam*). *See United States v. Terry,* 422 F.2d 704, 710 (D.C.Cir.1970) (approving factors listed in *United States v.*

---

**22.** *See* Tr. 169 (testimony of Officer Hardy); *id.* 52 (testimony of counterwoman Ms. Hardy). The majority does not dispute the overwhelming evidence that the bag was near the suspect when the victims viewed him. *See* maj. op. at 1165 n. 20.

**23.** Under direct examination by the government, one of the counterwomen (Ms. Taylor) testified that when the police brought Singleton into the store they also brought *both* the shotgun *and* the bag. Tr. 73. This testimony supports the presence of the gun at the showup. On cross-examination Ms. Taylor changed her mind with respect to the presence of the *bag, id.* 88, but she was never asked about the gun. Another counterwoman, Ms. Baptist, initially testified that "[w]hen [the police and the suspect] came back in for the identification[,] they had the shotgun * * *," Tr. 127, but she then said that she did not see the gun until after she made her identification, *id.* 127–128. On direct examination Mr. Singleton testified that he saw the bag *and* the shotgun at Gino's, *id.* 369. On cross-examination, in response to the prosecutor's assertion that the police had brought in "a bag and a sawed-off shotgun *inside* the bag," *id.* 388 (emphasis added), the defendant testified that he did not see the shotgun inside the bag because it was zipped up, *id.*

On the basis of this testimonial morass, the majority reaches the conclusion that "the gun may not have been visible" during the showup. Maj. op. at 1165 n. 20. The majority relies in part on its interpretation of Mr. Singleton's testimony under cross-examination. *Id.* But if the weapon was truly concealed in the zipped-up bag, then at least one if not both of the government's witnesses must have hallucinated the presence of the gun. This hardly bolsters the prosecution's case, and it would merely tend to confirm the suggestiveness of the entire showup procedure. *See also* text at p. 1176–1177 *infra* (government witness imagined nonexistent corroboration of identification).

**24.** Brief and Appendix for Appellant at 8 n. 11.

**25.** *See id.* at 7–8.

**26.** Tr. 117 (testimony of Ms. Baptist).

**27.** *See id.* 67 (testimony of Ms. Taylor) ("so busy watching the gun"); *id.* 28 (testimony of Ms. Hardy) ("staring at the shotgun"). *See also* text at pp. 1178–1179 & nn. 53–58 *infra.*

**28.** *Cf.* E. LOFTUS, EYEWITNESS TESTIMONY 142–144 (1979) (discussing unconscious transference).

*O'Connor, supra).* Moreover, the Supreme Court has stated that the "chance of misidentification is * * * heightened if the police indicate to the witness that they have *other evidence* that one of the persons [presented] committed the crime." *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968) (emphasis added; footnote omitted) (discussing photographic identification).

In this case, placement of physical evidence near Singleton could only serve to pollute the identification process. This suggestive practice, specifically disapproved in our prior cases, substantially increased the risk of misidentification.

2.  Statements of the police to the witnesses prior to the showup.

Past decisions in this circuit have also stressed that statements made to witnesses prior to a confrontation can increase the suggestiveness of the identification process. *See, e.g., Clemons v. United States, supra,* 408 F.2d at 1245 n. 16; *United States v. O'Connor, supra,* 282 F.Supp. at 965.[29] Here, before presenting Mr. Singleton to the counterwomen at Gino's, the police officers went into a back room at the restaurant and spoke to the four women. The police stated that they had a suspect in custody and they asked for "positive identifications."[30] As one of the identifying witnesses testified, the police asked if she "would come forth and give them a *positive identification* that the man that they had was in fact the same man that had held us up."[31]

Presentation of a single suspect to victims of a crime creates a situation "pregnant with prejudice. The message is clear: the police suspect *this* man."[32] When the suspect is in handcuffs, as Singleton was,[33] the message grows stronger. But when police officers prepare the witnesses by soliciting positive identifications, they needlessly predispose the witnesses and thereby magnify the risks of error.

3.  Grouping of witnesses during the identification process.

When the police presented the witnesses to Singleton, the three counterwomen who identified him stood very close together, roughly within an arm's length of one another.[34] At some point they signified their recognition, perhaps by nodding their heads.[35] The grouping of the witnesses strongly suggests that each identification did not result from the exercise of independent judgment. There are obvious dangers that the identifications were "the product of mutual reinforcement of opinion among witnesses simultaneously viewing defendant[.]" *United States v. O'Connor, supra,* 282 F.Supp. at 965 (discussing indicators of suggestiveness). *Accord, Clemons v. United States, supra,* 408 F.2d at 1245 n. 16.

The dangers of group identifications are starkly demonstrated by the testimony of one of the witnesses, Ms. Taylor. In response to government questioning, Ms. Taylor testified that another counterwoman, Ms. Allen, had stated to the police during the showup that she thought Mr. Singleton was one of the robbers.[36] However, Ms. Allen was the one counterwoman who *never* identified Singleton [37]; indeed, she was apparently in the back room at the time of the

---

29.  Cf. *United States v. Yates,* 524 F.2d 1282, 1284–1285 (D.C.Cir.1975) ("close" case presented when, *inter alia,* one detective told the victim merely that the police thought they had captured the burglar).

30.  Dist.Ct.Op., *supra* note 1, at 2.

31.  Tr. 124 (testimony of Ms. Baptist) (emphasis added).

32.  *Biggers v. Tennessee,* 390 U.S. 404, 407, 88 S.Ct. 979, 980, 19 L.Ed.2d 1267 (1968) (Douglas, J., dissenting from *per curiam* affirmance

by an equally divided Court) (emphasis in original).

33.  Maj. op. at 1165 n. 20.

34.  Tr. 54 (testimony of Ms. Hardy); *id.* 72 (testimony of Ms. Taylor).

35.  *See id.* 170 (testimony of Officer Hardy).

36.  *Id.* 73 (testimony of Ms. Taylor).

37.  *Id.* 305 (testimony of Ms. Allen).

showup![38]  Thus, the collective identification atmosphere caused one witness to imagine a nonexistent corroboration.

The police could easily have eliminated this defect in Singleton's identification. The witnesses should have been brought to the suspect one at a time and kept apart until all the attempted identifications ended. Instead, the officers needlessly increased the risks of misidentification.

B. *The Absence of Certain Key Indicia of Reliability*

The police should obviously never act so as to exacerbate the inherent suggestiveness of a showup. But equally important, in my judgment, the police should undertake measures to minimize the risks of misidentification. Otherwise, the dangers attendant to the use of an "inherently suggestive" procedure go unchecked and serious doubt must be cast on the reliability of the resulting identifications. In this case, for no apparent reason the police failed to implement basic safeguards that would have reduced the odds of misidentification.

1. The police officers' failure to obtain a description of the robbers prior to the showup.

One crucial procedure for obtaining independent verification of the accuracy of a subsequent showup is for the police to secure descriptions of the suspects from each witness individually *before* a confrontation.[39] In cases where the showup produces positive identifications, this procedure allows comparison of verbal descriptions of the alleged criminal with the actual characteristics of the suspect. Significant discrepancies between the suspect as described by witnesses and the suspect identified in a showup would substantially undercut the showup evidence.

The majority admits that "the police never asked the victims for a description of the robbers before the showup, which they certainly could and *should* have done." Maj. op. at 1165 n. 20 (emphasis added). I doubt that the majority's admonition will give Mr. Singleton much solace. Moreover, the Supreme Court long ago listed "the accuracy of the witness' prior description of the criminal" as a key factor to be considered in evaluating whether a confrontation procedure was suggestive. *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382. Since no such description exists, the reliability of the subsequent identification is diminished.

2. The failure to arrange a lineup after the showup.

The majority discounts the absence of an in-court identification in this case. Maj. op. at 1167. I agree with the court that "ritualized in-court identifications"[40] have little value. Of greater significance, however, is the government's failure to conduct a lineup at any point after Mr. Singleton's arrest, especially prior to the indictment. This failure is troubling because a fair lineup[41] is generally considered "[t]he best method yet devised for the avoidance of suggestion in corporeal identifications—a method 'infinitely better' than the presentation to the witness of a single suspect * * *."[42]

To be sure, the reliability of positive identifications from a lineup that follows a showup can be questioned. The image of a suspect suggestively presented during a showup may remain vivid and undermine the independent value of a subsequent confrontation. Thus recognition at a lineup may merely confirm that a suspect was present at the showup, but *not* at the crime. On the other hand, a fair lineup forces

---

**38.** *Id.* 302.

**39.** These descriptions need not be exhaustive. As the Supreme Court has stated, they do not have to "satisf[y] Proust." *Neil v. Biggers, supra* note 18, 409 U.S. at 200, 93 S.Ct. at 382.

**40.** Maj. op. at 1167.

**41.** For an elaboration of what a fair lineup entails, *see* N. Sobel, Eye-Witness Identification § 56.03 at 104–108 (1972).

**42.** P. Wall, Eye-Witness Identification in Criminal Cases 40 (1965) (*quoting* Cartwright, 10 Crim. App.R. 219, 221 (1914)) (footnote omitted).

witnesses to identify a suspect with a minimum of suggestion. If the witnesses cannot select a suspect from those on line, it will inevitably raise doubts about the initial showup identification.[43] For instance, in the case at hand the showup identification may have resulted more from recognition of physical evidence than of personal characteristics; a subsequent lineup would highlight such a deficiency. Also, witnesses seemingly confident of their identifications during a showup may display real doubts in the face of a lineup.

While the failure to conduct a subsequent lineup, taken alone, deserves no special weight, such a lineup can serve as a useful check on the showup process. Because the government must prove guilt beyond a reasonable doubt, it should take such precautions in cases involving suggestive showups in order to reduce doubt.[44]

### C. Indicia of Reliability Asserted by the Majority

Despite all the infirmities of the showup, the majority nonetheless contends that "the showup at issue here took place under circumstances which would tend to promote reliability." Maj. op. at 1166. In particular, the majority lists three aspects of the showup that supposedly buttress its reliability.[45] Each of these indicia is discussed below.

1. Opportunity to view the culprits.

The majority asserts that the witnesses had "ample opportunity to view the culprits at close range in good lighting conditions."[46] Whatever their *opportunities* for viewing the culprits, the record makes clear that the witnesses did not in fact get a very good look at the man with the shotgun.

Ms. Taylor was apparently the first counterwoman to identify Singleton.[47] Yet, she waited on the "other robber," *not* the man with the shotgun.[48] Indeed, it was not until the "other robber" told her to open her register and put the money in the bag that she even realized that there was "another dude standing on the next register robbing the other counter girls."[49] She only "glanced" at the robber with the shotgun "just once"[50] at a distance of 12 to 15 feet.[51] Even so, she testified that she "didn't really glance up at him" and "didn't take a glance at his face that good."[52] The reason was simply that she "was so busy watching the gun * * *."[53] A second counterwoman, Ms. Hardy, also "was staring at the shotgun,"[54] although she "could still glance up at [the robber], too."[55] Psychological studies have shown that individuals

---

**43.** Of course, other explanations such as a lapse of memory might explain an inability to make an identification at a lineup.

**44.** The Supreme Court recognized another potential indicator of reliability in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The witness in that case was a "specially trained" and "experienced" officer attentive to detail. *Id.* at 115, 97 S.Ct. at 2253. Such is *not* the case here. *See, e.g.,* Tr. 20 (testimony of Ms. Hardy) ("I came out of school kind of early, so I don't know too much about inches.").

**45.** The showup took place within two or three minutes after the robbery, at the scene of the crime. The witnesses had ample opportunity to view the culprits at close range in good lighting conditions. In addition, the witnesses were quite certain of their identifications. Maj. op. at 1166 (footnote omitted).

**46.** *Id.* at 1166. With respect to the "good" lighting conditions, one of the counterwomen testified that the lights were "kind of dim." Transcript of Motions Hearing 16 (testimony of Ms. Taylor). *Cf.* maj. op. at 1166 n. 22 (quoting other parts of her testimony).

**47.** Tr. 86 (testimony of Ms. Taylor).

**48.** *Id.* 59–60.

**49.** *Id.* 61.

**50.** *Id.* 77.

**51.** *Id.* 64.

**52.** *Id.* 67.

**53.** *Id.* 68.

**54.** *Id.* 28 (testimony of Ms. Hardy).

**55.** *Id.*

under high stress tend to focus on relatively few features of their environment.[56] Where a weapon is brandished it tends to capture a good deal of attention, thereby reducing the ability to recognize and to recall details about an assailant.[57] This "weapon focus" phenomenon [58] appears evident here. The third witness, Ms. Baptist, also averted her gaze. As she testified, "[M]y attention was on the bag and the money and anything other than [the robber with the shotgun]. I just didn't want to look at him to make him nervous." [59] These facts hardly seem conducive to reliable identifications.

### 2. Certainty of the identifications.

The majority claims that the witnesses were "quite certain" of their identifications. Maj. op. at 1166. Yet innumerable authorities have concluded that a witness' degree of certainty in making an identification generally does not measure its reliability. *E.g.,* P. WALL, EYE-WITNESS IDENTIFICATION IN CRIMINAL CASES 15–16 (1965); Clifford & Scott, *Individual and Situational Factors in Eyewitness Testimony,* 63 J. APPLIED PSYCHOLOGY 352 (1978); O'Connor, *"That's the Man": A Sobering Study of Eyewitness Identification,* 49 ST. JOHN'S L.REV. 1, 4–6 (1974). *See* Note, 29 STAN.L.REV. 969, 985 & n. 57 (1977) (citing several studies); *People*

*v. Anderson,* 389 Mich. 155, 217–229 & n. 42, 205 N.W.2d 461, 493–494 & n. 42 (1973) (citing psychological studies).[60] Indeed, a *negative* correlation sometimes exists between a witness' confidence and the accuracy of the identification.[61]

At the same time, if we are to rely upon the certainty of the witnesses, it is crucial to keep in mind that the witnesses were also positive about a number of aspects of their testimony that directly conflict with their identifications. *See* Part III *infra.*

### 3. Timing and location of the showup.

The majority also notes that the showup took place "within two or three minutes after the robbery, at the scene of the crime." Maj. op. at 1166. That the showup took place "at the scene of the crime," hardly a neutral location, does little to support its reliability.[62] On the other hand, this court has justifiably cautioned against delays of several hours in arranging showups.[63] In contrast, the showup in this case took place unusually promptly. But the exceptional speed in arranging the showup was not without drawbacks. In their haste the police failed to secure descriptions from the witnesses prior to the showup.[64] Also, "two or three minutes after a robbery," those present at a crime undoubtedly remain under a good deal of stress and are

**56.** Easterbrook, *The Effect of Emotion on the Utilization and Organization of Behavior,* 66 PSYCHOLOGICAL REVIEW 183 (1959). *See* Note, 29 STAN.L.REV. 969, 980 & n. 34 (1977) (citing other psychological studies).

**57.** E. LOFTUS, *supra* note 28, at 35.

**58.** *Id.* ("The term *weapon focus* has been used to refer to the situation in which a crime victim is faced with an assailant who is brandishing a weapon.") (emphasis in original).

**59.** Tr. 117.

**60.** *But cf. Neil v. Biggers, supra* note 18, 409 U.S. at 199, 93 S.Ct. at 382 (including level of certainty in list of factors suggesting reliability). *Contra Manson v. Brathwaite, supra* note 44, 432 U.S. at 130, 97 S.Ct. at 2261 (Marshall, J., dissenting) ("[T]he witness' degree of certainty in making the identifications * * * is worthless as an indicator that he is correct.")

(footnote omitted); *see United States v. Wade,* 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) (once witness has identified suspect, he is unlikely to go back on it).

**61.** Buckhout, *Eyewitness Testimony,* SCIENTIFIC AMERICAN 23, 30 (Dec. 1974); E. BORCHARD, CONVICTING THE INNOCENT 50 (1932); *see* Note, *supra* note 56, 29 STAN.L.REV. at 985 n. 57.

**62.** *See generally United States v. O'Connor,* 282 F.Supp. 963, 965 (D.D.C.1968), *aff'd,* 420 F.2d 644 (D.C.Cir.1969) (*per curiam*).

**63.** *McRae v. United States,* 420 F.2d 1283, 1290 (D.C.Cir.1969) (showup taking place four hours after the crime held impermissible). *Cf. Bates v. United States,* 405 F.2d 1104, 1105–1106 (D.C.Cir.1968) (showup occurring "at most 30 minutes after the attack" held permissible).

**64.** *See* text at p. 1177 *supra.*

therefore *less* reliable as witnesses.[65] For instance, one of the counterwomen, Ms. Allen, could make no identification[66] despite having seen the man with the shotgun[67] because she was still so "scared."[68]

### D. *Evaluating the Showup*

The conduct of the police in this case needlessly and seriously aggravated an already inherently suggestive identification procedure. At the same time, the indicators of reliability of the showup seem relatively minor. On balance, in my view, the record substantiates a showup so suggestive that it posed a very substantial likelihood of misidentification. Testimony based on it should have been excluded on due process grounds. *See Neil v. Biggers, supra,* 409 U.S. at 198, 93 S.Ct. at 381.

At the very least, I do not see how the showup identifications can suffice to support a finding of guilt beyond a reasonable doubt. Nevertheless, the majority is willing to give the jury a free hand in such cases.[69] *See* maj. op. at 1166. Yet a number of authoritative studies have concluded that juries are unduly receptive to such evidence. *See, e.g.,* E. LOFTUS, *supra,* at 8–19; P. WALL, *supra,* at 19–23; G. WILLIAMS, THE PROOF OF GUILT 119–120 (3d ed. 1963); Hammelman & Williams, *Identification Parades—II,* CRIM L.REV. 545, 550 (1963). Experimental studies starkly support this proposition.[70]

The serious hazards of eyewitness identifications can clearly justify intervention by a trial judge. The Supreme Court has cautioned that " '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.' " *United States v. Wade,* 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) (*quoting* P. WALL, *supra,* at 26). *See, e.g., Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) (Lumbard, J.) ("Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect."); F. FRANKFURTER, THE CASE OF SACCO AND VANZETTI 30 (1972) ("The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.").

The District Court concluded that this case presented "a clear-cut example of the dangerous potential of the one-man 'showup' for tragic misidentification."[71] I agree. Based on the infirmities of the showup alone, the District Court's judgment should be affirmed.

---

**65.** *See* Buckhout, *supra* note 61, SCIENTIFIC AMERICAN at 25; E. LOFTUS, *supra* note 28, at 33–35.

**66.** Indeed, she could not even recollect whether the police had asked her to make an identification. Tr. 305 (testimony of Ms. Allen).

**67.** *Id.* 300–301.

**68.** *Id.* 298, 305. Ms. Allen also described herself as "afraid" (*id.* 299) and "nervous" (*id.* 301).

**69.** Because, in my view, the evidence should never have been admitted, this argument has little force in this case.

**70.** *E.g.,* Loftus, *Reconstructing Memory: The Incredible Eyewitness,* PSYCHOLOGY TODAY 116 (Dec. 1974). Dr. Loftus simulated a criminal trial using 150 students as jurors. Each juror received a description of a grocery store robbery and murder and a summary of the evidence and arguments presented at trial. One-third of the jurors were given only this evidence; only 18% of these jurors judged the defendant guilty. Another group of 50 jurors received an additional piece of prosecution evidence. They were told that a clerk testified that he had seen the defendant shoot the two victims, although defense counsel claimed he was mistaken. Of these jurors, 72% voted for conviction. A third version of the case was given to another 50 jurors. They were told of the clerk's testimony but were informed that the defense had discredited him by showing that he had not been wearing his glasses at the time and, since he had uncorrected vision poorer than 20/400, he could not possibly have seen the face of the robber from where he stood. Of the jurors who heard of the discredited eyewitness, an astonishing 68% still returned guilty votes.

**71.** Dist.Ct.Op., *supra* note 1, at 1.

III.  INDEPENDENT TESTIMONY FROM THE
IDENTIFYING WITNESSES UNDERMINES
THE SHOWUP IDENTIFICATIONS

According to the District Court, the showup identifications were "flatly contradicted by the independent recollections of the [identifying] witnesses * * *." [72] The majority admits the presence of "incongruence in the testimony of the witnesses." Maj. op. at 1166. *Accord id.* (conceding "variations, to be sure" in witness' testimony). Nonetheless, the majority finds such discrepancies only natural given the lapse of time before trial, noting that it would be " 'a rare case indeed if all the testimony of the prosecution were in perfect harmony.' " *Id.* at 1166 (*quoting Gov't of the Virgin Islands v. Petersen,* 507 F.2d 898, 901 (3d Cir.1975)).

In my opinion, key testimony in this case did not merely fail to harmonize; it was resoundingly dissonant. In particular, in describing the clothing and facial appearance of the man with the shotgun (supposedly Mr. Singleton), the identifying witness' testimony diverges dramatically from Mr. Singleton's appearance the night of the robbery.

With respect to clothing, Ms. Hardy testified that the man with the shotgun wore a long-sleeved "Peterson" jacket buttoned around the wrists [73] and blue jean pants.[74] According to Ms. Taylor, the same robber wore an old, faded blue jean jacket with hook buttons and long sleeves rolled down.[75] The third identifying witness, Ms. Baptist, had no recollection of what the robber with the shotgun wore.[76] *In contrast to the descriptions,* Government Exhibit No. 4—a color photograph taken during processing at headquarters—depicts Mr. Singleton as he actually appeared when arrested. On that night the defendant wore a black zippered shirt-jacket that had *short* sleeves cut off above the elbow in a conspicuously jagged manner.[77] The photo also shows Singleton in a pair of light tan trousers.[78] Thus Mr. Singleton's clothing in all respects contradicts the witness' descriptions. Indeed, when shown the photograph, Ms. Taylor testified that she was "positive" that the man who held the shotgun did *not* have on Mr. Singleton's clothes.[79]

As for facial appearance, Ms. Baptist was "pretty sure" that the robber with the shotgun did not have a beard, though she was unsure about the presence of a mustache.[80] His hair was a "small" close-cut afro.[81] Ms. Taylor thought the man might have had a mustache, but she "*knew* he didn't have a beard. * * * His face looked kind of clean." [82] She remembered the robber's hair as "bushy," [83] although she recalled that the robber also wore an orange knitted cap on his head.[84] Ms. Hardy had little recollection of the robber's facial appearance,[85] but she thought the individual had a goatee,[86] "a little bit of hair on the chin." [87] In reality, Government Exhibit No. 4 shows Singleton with a *beard* and mustache and very bushy though receding hair, without any cap.[88]

72.  *Id.* at 4.

73.  Tr. 40, 42.

74.  *Id.* 39–40.

75.  *Id.* 80–81.

76.  *Id.* 132.

77.  Dist.Ct.Op., *supra* note 1, at 3; Tr. 236, 363.

78.  *Id.* 363.

79.  *Id.* 93.

80.  *Id.* 133.

81.  *Id.* 115.

82.  *Id.* 79 (emphasis added).

83.  *Id.* 68.

84.  *Id.* 69.

85.  In general, she seemed quite confused. *Id.* 41 ("This is just not my day to be in here.").

86.  *Id.* 42.

87.  *Id.* (question of Attorney Wilhite).

88.  However, Mr. Singleton testified that when arrested he was wearing a white golfer's cap that the police kept as evidence. *Id.* 363–364. (At the time of his arrest Mr. Singleton worked at a country club.).

Other inconsistencies in the witnesses' testimony abound.[89] The key point, however, is that the witnesses' independent descriptions of the robber conflict directly with Mr. Singleton's actual clothing and facial appearance on the night of the robbery. Under these circumstances, any jury surely must entertain a reasonable doubt.[90]

## IV. Conclusion

Thus, I initially part company with the majority because of its failure to accord consideration to the District Court's assessment of the evidence as required by the *en banc* court in this case. Nonetheless, even under its own approach, the majority in my judgment seriously errs. The showup conducted in this case cannot suffice to support a criminal conviction; indeed, it violated due process. When, in addition, the identifying witnesses testify in a manner that contradicts their showup identifications, any reasonable jury surely must entertain a reasonable doubt if that term is to have any meaningful content.

I therefore respectfully dissent in No. 81–1810.

---

**89.** *Compare, e.g., id.* 48 (testimony of Ms. Hardy) (both robbers exited on Florida Ave.) *with id.* 70, 75 (testimony of Ms. Taylor) (robbers exited through different doors, one on North Capitol St., the other on the opposite side of the restaurant) *and id.* 120–121 (testimony of Ms. Baptist) (same). *Compare, e.g., id.* 96 (testimony of Ms. Taylor) (other robber wore plain white short-sleeved shirt) *with id.* 120, 132, 141 (testimony of Ms. Baptist) (other robber also wore a short-length, open jacket).

**90.** This conclusion is true even though all reasonable inferences are given to the government. Such an assumption does not allow us simply to ignore whole parts of the record in this case.