# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

    v.

Tavaras C. Wood

April 16, 2001

Case No. CR00003038

BY JUDGE LYDIA CALVERT TAYLOR

This matter came before the Court for an evidentiary hearing on November 2, 2000, on Defendant's Motion to Suppress both out-of-court and in-court identifications by witnesses Frank Crummitt, Hector Reyes, and Whitney Lowrance; each identified Defendant, who is charged with a robbery they witnessed, shortly afterward and near the scene. Defendant argued that the out-of-court identification took place at a showup[1] that was so suggestive that not only should its results, the witnesses' out-of-court identification at the showup, be suppressed but also any later in-court identification as well, as impermissibly based on the prior suggestive showup, rather than having as its origin the view by the witnesses of the defendant at the time of the crime. Defendant therefore claims that any in-court identification would have a high likelihood of misidentification, as likely based on the suggestive showup, in violation of Defendant's rights to due process of law, rather than having its

---

[1] This opinion refers to the police procedure used in this case as a "showup," because it took place near the scene of the crime under exigent circumstances, and was used in order to quickly determine probable cause without taking suspects and others to the police station for a more formal lineup. The procedure, however, was in fact more of a lineup because several persons the same race, age, and size as the suspects were shown to the crime victims.

origin in the view the witnesses/victims had of the perpetrator at the time of the commission of the crime. The prosecution, in contrast, argued that the showup was not so suggestive that its results, the out-of-court identification, should be suppressed and that, at any rate, the in-court identification did not have a substantial likelihood of misidentification as, based on the factors set out in long-standing case law, any in-court identification would be based on the witnesses' view of the Defendant at the time of the crime, untainted by the showup, even if the Court were to find it suggestive.

This Court finds that the out-of-court identifications of the Defendant by Crummitt and Reyes may be admitted and that the two will be allowed to identify the Defendant at trial, because, even if the police procedures were suggestive, the totality of the circumstances using the five relevant factors, including the witnesses' prior detailed descriptions of the Defendant, demonstrate that the identifications were sufficiently reliable that there is no substantial likelihood of misidentification. It follows that any in-court identifications will similarly be admitted if made at trial.

*Factual Background*

On May 12, 1990, during the late evening hours, on 21st Bay in the City of Norfolk, Frank Crummitt, Hector Reyes, and Whitney Lowrance were robbed by two men. Crummitt described both men as black, neither wearing a mask, and one of the men as having a gun. Lighting conditions were moderate, with light from the street lights, he said, enabling him to clearly look at one of the men, the man without the gun, for approximately forty-five seconds, and to describe the man's clothing and height and weight. He described one man as wearing a white cloth, like a bandanna or headdress, on his head, with what Crummitt thought were dreads underneath it; he was dressed in a plain white T-shirt and long bluish-black below-the-knee pants and white socks. Crummitt described the man as five feet, four inches to five feet, eight inches tall, and between 130 to 150 pounds, with skin color not extremely dark or light, but somewhere in the middle. Crummitt gave that physical description to a police officer, who then left; approximately 15 minutes later, another police officer came to Crummitt's location and had Crummitt and the other two witnesses sit in a police car, which was then driven to another location. At that second location, the police brought six or seven people, one at a time, in front of the police car in which the witnesses were sitting; each of the witnesses was asked to tell the police officer in the car if he or she saw either of the two men who robbed them. Crummitt, upon recognizing one of the men that the police brought to the front of the car in

which he was sitting, said, "That's him;" at the hearing, he testified that the two other witnesses both said the same thing at the same time. Crummitt then identified the Defendant in court as one of the men who robbed him and as the man he had later identified at the police showup. Crummitt stated that he was one hundred percent certain of the identification, both at the time he made the identification at the showup and at the time of the suppression hearing. He testified that he did not base his identification on any identification of the Defendant provided by the other two witnesses.

Hector Reyes, who also was robbed by the two men on the night of May 12, 2000, described both robbers to a Norfolk police officer — one as a young black male in his twenties, wearing a ball cap, dark blue shirt, and jeans and the other as slightly shorter, with dreads in his hair, a dark doo-rag, white tank top, and dark-colored pants, neither wearing a mask. He stated that there were bright streetlights in the area, allowing him to see the two men clearly. Reyes testified that he was taken with the other two witnesses in a police car to another location, where the three witnesses were shown 14 individual suspects. Reyes only recognized the final suspect as the man wearing the white tank top and dreads, but he did not recall the doo-rag. Reyes testified that Crummitt immediately said, "That's him," when the fourteenth man came into view; that he and Ms. Lowrance said, "That's him" at approximately the same time.[2] Reyes identified the Defendant at the suppression hearing as the final suspect whom he and the others had identified at the showup that night. He also testified that he asked the police officer to turn the suspect around so he could be sure of his identification, and he acknowledged that in part, the man's clothing and dreads caused him to identify the final suspect as one of the men who robbed him, but Reyes added that he was one hundred percent certain of his identification of the Defendant at the showup and at the hearing.

Officer John Kowalski of the Norfolk Police Department, who was on duty on the night of May 12, 2000, noticed the Defendant initially at approximately 18th or 19th Bay Street; he came into contact with him again at 16th Bay and Pleasant Avenue in Norfolk, a few minutes later. He had initially seen two black men running westbound on Pleasant Avenue at approximately 17th or 18th Bay; he then heard a message over his police radio, approximately two minutes later, that a man had been robbed by two black males at 20th Bay and that the two last were seen going westbound.

---

[2] Ms. Whitney Lowrance was also present with Crummitt and Reyes when the robbery and showup took place. Because Ms. Lowrance was only sixty-five to seventy percent sure of her identification on the night of the robbery, the Commonwealth concedes that her out-of-court identification of the Defendant should not be allowed and it is suppressed, *infra*.

Therefore, Officer Kowalski turned his patrol car around to begin looking for the two men he had seen a few minutes earlier. The descriptions on the radio call was two black males, one with small dreads, wearing a T-shirt and shorts, which matched the two men he had seen running on Pleasant Avenue. When he arrived at 16th Bay and Pleasant Avenue, he saw people on a porch, the Defendant among them. Recognizing the Defendant as one of the two men he had seen running on Pleasant Avenue, he walked up to him. Although the Defendant seemed nervous, he cooperated with Officer Kowalski. Kowalski broadcast to Officer Reed, the officer who had earlier interviewed the three witnesses, that he had a possible suspect and for Officer Reed to come to 16th Bay and Pleasant Avenue. Approximately ten minutes later, Officer Reed arrived with the three witnesses in his police car. The showup of the fourteen black men, as described as above, followed. There was no testimony that the men were greatly different in looks from the Defendant.

Defendant's only contention of suggestiveness is that the Defendant was the only person in the showup with a tank top and the only one not brought out from the house. The police clearly had to use the people who were there at the house for any lineup, as they were not at the station. Neither witness noted at all or at least attached any significance to where the men were brought from, the house or a car.

## Discussion

The constitutional considerations related to an arrest scene showup involve determining if the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identity that [the suspect] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301 (1967). This determination is based upon examining "the totality of the circumstances surrounding [the showup]," *Martin v. Commonwealth*, 210 Va. 686, 689, 173 S.E.2d 794, 797 (1970) (quoting *Stovall*, 388 U.S. at 302), but "the admission of evidence of a showup without more does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *see also Smith v. Thompson*, 1 Va. App. 407, 411 (1986) (relying on the logic of *Biggers*.). Thus, the government may introduce an out-of-court identification, made at a showup, as well as a later in-court identification after an earlier showup identification, so long as the prosecution meets the burden of demonstrating that both identifications are reliable, even if the earlier one was suggestive. *See Manson v. Brathwaite*, 432 U.S. 98 (1977).

Accordingly, evidence of an out-of-court identification "will be admitted if either (a) the identification procedure was not unduly suggestive, or (b) the

procedure was unduly suggestive, but the identification is so reliable, in accordance with the factors noted in *Biggers* and *Brathwaite*, that there is no substantial likelihood of misidentification." *Hill v. Commonwealth*, 2 Va. App. 683, 693, 347 S.E.2d 913, 918 (1986). Even if evidence of an out-of-court identification cannot be admitted, however, an in-court identification may still be permissible if the origin of the identification is independent of the inadmissible out-of-court identification process. *See Hill*, 2 Va. App. at 693, 347 S.E.2d at 918. In establishing the reliability of a particular identification, the court must consider:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Townes v. Commonwealth*, 234 Va. 307, 331, 362 S.E.2d 650, 663 (1987) (quoting *Biggers*, 409 U.S. at 199), *cert. denied*, 485 U.S. 971 (1988); *Delong v. Commonwealth*, 234 Va. 357, 367, 362 S.E.2d 669, 674 (1987), *cert. denied*, 485 U.S. 929 (1988). The United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98 (1977), added that the *Biggers* factors must be balanced "against the corrupting effect of the suggestive identification itself." *Id.* at 114. The reliability of the identifications of Defendant should be addressed through an application of the *Neil v. Biggers* factors to the specific facts of this case.

### Application of Neil v. Biggers Factors

The Court will first apply the five *Neil v. Biggers* factors to Crummitt's out-of-court identification. First, Crummitt testified, as to his opportunity to view the Defendant, who wore no mask at the time of the crime, that he looked at the Defendant for at least forty-five seconds under streetlights. The observation time and lighting apparently allowed Crummitt to focus sufficient attention on the Defendant that Crummitt could describe the Defendant in some detail to the police on the night of the robbery and in court as to height, weight, skin tone, clothing, type of hair, hair covering, and even sock color.

On the issue of the accuracy of Crummitt's prior identification of the robber's height, weight, and skin tone, as well as clothing, a white T-shirt and dark short-type pants, it matched how the Defendant looked at the showup,

except for the lack of a head covering, which would have been easy for the perpetrator to discard after the crime.

As to the fourth factor, the witness's level of certainty at the confrontation, Crummitt testified that the police officer in the car with the witnesses told them not to point anyone out unless they were sure it was the right person. Crummitt then testified that he was one hundred percent sure that he identified the right man at the time of the showup; he said, "That's him," at approximately the same time as the other two witnesses. (Reyes said Crummitt *immediately* said, "That's him.")

Concerning the final factor, the length of time between the crime and the confrontation, Crummitt contacted the police immediately after the robbery, and the showup took place approximately fifteen minutes later. Thus, Crummitt's out-of-court identification satisfies the five *Neil v. Biggers* factors and is reliable even when weighed against any possible suggestive nature of the showup.

Next applying the five factors to Reyes' out-of-court identification, Reyes had the same opportunity as Crummitt to view the Defendant at the scene of the crime without a mask, under "bright" streetlights, where he could see their faces.

Second, Reyes gave police a detailed description of both: the other robber's age, what he was wearing on his head, the white tank top and dark-colored pants (and their type) that he was wearing, that he had dreads, as well as the fact that the Defendant as wearing a doo-rag. Reyes' detailed descriptions of both men show a high degree of attention to the robbers, as he testified was the case.

As to the accuracy of Reyes' prior description of the Defendant, his description matched the Defendant as he appeared when Reyes identified him at the showup, according to police testimony.

Reyes, like Crummitt, also had a high level of certainty at the confrontation when he identified the Defendant as one of the robbers. After asking the police officer to turn the Defendant around one more time so he could be sure he was identifying the right person, Reyes testified that at that point, he was positive that he was identifying the man who had robbed them.

The final factor, the length of time between the incident and the showup (or confrontation), is the same for Reyes as for Crummitt — about fifteen minutes. Thus, Reyes' pretrial out-of-court identification, also measured by the five factors of the *Neil v. Biggers* test, is sufficiently reliable to be allowed at trial, even though the showup — in fact, a lineup — had some suggestive elements.

*Multiple Witnesses at the Showup*

Where witnesses are together when they make an identification, there is a danger that the identification by the first could influence the others in making their decisions. Here, Crummitt and Reyes both said all three spoke almost simultaneously and that each decided which man was the Defendant independently of the other's decision. This Court then examined how courts outside Virginia have treated such a situation, given that no Virginia cases were found in which multiple witnesses were present at a showup or lineup at the same time. Other jurisdictions that have ruled on the question of the admissibility of an out-of-court identification that occurred under such conditions essentially have followed the "totality of the circumstances" analysis to determine whether the identifications were reliable, or not reliable because they were too dependent on one another's recognition.

In *United States v. Singleton*, 702 F.2d. 1159 (D.C. Cir. 1983), the trial judge's decision that the evidence was insufficient to support a jury verdict of guilty of armed robbery and his grant of acquittal notwithstanding was largely based on the presence of multiple victims, which he found to be *per se* suggestive. The appellate court vacated that acquittal and remanded with instructions to reinstate the jury verdict, finding that the evidence was sufficient to support the jury's guilty verdicts.

The facts in *Singleton* — involving as it did a far more suggestive showup than the instant case — were weaker for the prosecution than here.[3] Two police officers in a car were stopped in front of a restaurant when they saw two black men exit and head toward the officers but begin to run the other way when they spotted the marked police car. Suspecting a robbery in that high crime area, one officer got out and gave chase on foot, losing one of the men in the alley, while the other drove the police car around the corner. Not more than ten seconds, and twenty to twenty-five yards, from where the police had seen the men leaving the restaurant, he saw a black male in the same apparel as one of the men — later identified as the defendant — walking at a fast pace; he slowed to a normal gait when he noticed the police car. As the officer on foot came out of the alley, he recovered a gym bag with a sawed-off

---

[3] The dissent argued that the Government had based its case on eyewitness identifications during a showup that was conducted "in an extraordinarily suggestive manner" and could not therefore support a criminal conviction because they were so suggestive that they constituted a denial of due process. He wrote that "the very witnesses who made the identifications testified at trial in ways that fatally undermined the defendant's alleged guilt" and thus no jury could have found the defendant guilty on those facts. *Id.* at 1170-71.

shotgun. (One of the robbers had brandished a sawed-off shotgun taken from a zippered bag during the robbery. *Id.* at 1161.) At a showup at the restaurant immediately after, the defendant was identified positively by three of the four counterwomen present at the robbery. "Testimony regarding these identifications was a keystone to the Government's case. . . ." *Id.* at 1164. The first counterwoman had the robber with the gun within her sight for about two minutes, two to three feet away, and, "although she was primarily staring at his gun, she could still glance up at him." She identified the defendant at the scene as the one with the gun; at trial, she said she was very positive of her identification, that she would never forget how he looked, and that she had happened to see him, maybe twice, after that. (He apparently was on bond.) The second counterwoman testified that she recognized defendant "as soon as the police brought him through the door" of the restaurant, even before she was asked to identify him; she was sure of her identification, "[a]lthough she glanced at the robber's face only once." Later in her testimony she said, "well, I didn't really glance up at him. I didn't take a glance at his face that good." *Id.* at 1164, n. 17. The third counterwoman testified that "she looked directly at the man with the gun, who was within an arm's length of her," during the course of the robbery. When defendant was brought into the restaurant, she testified she was "more than positive" that he was the same man because the incident was "fresh in [her] mind" and "his face was implanted on [her] mind." The fourth counterwoman was too frightened to recall whether she was even asked to identify defendant by the police. *Id.*

The trial court, in overturning the verdict, based its decision on the suggestiveness of the lineup, "a broad divergence between the witnesses' recollections of Singleton's appearance on the evening of the robbery," and the variance between the witnesses' recollections at trial and a photograph taken at the police station after his arrest. The photo showed him with a beard, moustache, and bushy hair in a dark zippered jacket with jagged cutoff sleeves, light brown pants, and white tennis shoes; the recollections of the witnesses at trial were at some variance from the photograph. *Id.* at 1164-65.[4]

Although the appellate court shared the concern about the showup, stating it was "undoubtedly conducted in a highly, perhaps unnecessarily, suggestive manner," that court pointed out that "[i]mmediate on-the-scene showup identifications, while recognized as inherently suggestive, have long been

---

[4] "[T]he district judge expressed his concern regarding the suggestive nature of the showup conducted at [the restaurant] and emphasized that the independent recollections of the witnesses substantially contradicted the showup identification." Thus, he concluded the jury must have had a reasonable doubt and should not have convicted the defendant. *Id.* at 1165.

upheld by this court," because "prompt confrontations will 'if anything promote fairness by assuring reliability. . .'." *Id.* at 1165-66 (citations omitted). The fact that (1) the showup took place within two to three minutes after the robbery at the scene of the crime, (2) the witnesses had had ample opportunity to view the defendant at close range and in good lighting conditions,[5] and (3) the certainty of their identifications, all "tended to promote reliability." *Id.* at 1166 (footnote omitted). Variations existed between the recollections of the witnesses as to the robber's appearances, they found, but the incongruence was not fatal, where inconsistencies were emphasized on cross-examination and argued to the jury in closing, adding that "pre-trial identifications are often more probative than ritualized in-court identifications." *Id.* at 1167 (citation omitted).

Substantial differences between the facts of the showup in *Singleton* and the showup in the instant case make a stronger case for allowing the identifications here than in *Singleton*. "[T]he suspect was handcuffed and in police custody" at the time of the showup; at least one of the women remembered one of the police "stating that they had a man thought to be one of the robbers and asking for a positive identification," "the bag [with the gun] was positioned near the suspect when the victims viewed him, although the gun may not have been visible,"[6] and the victims were not asked for a description of the robbers before the showup, "which they certainly could and should have done," all points the appellate court criticized, none of which factors are present in the instant case.[7]

In contrast, in the instant case, the Defendant was not clearly in police custody and handcuffed. No suggestive placement was made of any of the objects used in the robbery near the Defendant himself; no one told the witnesses "they had a man thought to be one of the robbers and asking for a positive identification" in the instant case; and the police did ask for and receive detailed descriptions of the robbers before they conducted the showup. Although the police in this case did not conduct a lineup later, in fact the showing of the Defendant to the witnesses at the scene, although this Court has referred to it as a showup, was in fact a lineup, not a showup, given that the Defendant was only one of at least fifteen young black males present at the

---

[5] The lighting had been "about like" the courtroom's lighting, described as "good" by one witness.

[6] The defendant "himself testified that, although the bag was beside him during the showup, it was zipped up and the gun was not visible. . . ." *Id.* at 1166, n. 20.

[7] With one exception, the failure to conduct an unsuggestive lineup at any time following the showup "to further clarify the identification" was criticized, and such an unsuggestive lineup was also not conducted in the instant case.

scene, all of whom were shown to the three witnesses. Although there was not, as there could not be at the scene, a careful selection of only those young black males who resembled each other in various ways, because they were not at the police station, nevertheless just the presence of so many other young black males, each of whom was led to the car and shown to the witnesses, made the procedure used in the instant case far less suggestive than in *Singleton*. One witness did state he believed the Defendant was the only one brought out of a police car. Nevertheless, the appellate court in *Singleton* reinstated convictions based on eyewitness evidence, despite that very suggestive showup.

In *United States v. Pierce*, 508 F.2d. 197 (7th Cir. 1974), the issue was "whether testimony concerning an admittedly suggestive pre-indictment lineup should have been excluded from [habeas] petitioner's state criminal trial" for attempted robbery of a taxi driver. The facts in the trial had been that at 3 a.m. the victim, driving a cab, saw two males standing behind a parked car with the hood up; the two hailed the driver, leading him to believe they were out of gas, so he pulled around the corner to meet them under street lights. As they entered the cab, the dome light went on automatically; the driver testified he looked at the two men as they entered the cab, drove two blocks, heard one say something, and turned around. At that point, he saw one of the men holding a gun, which he grabbed impulsively, hitting the brakes, and causing his cab to crash into a parked car; he then "flipped into the back seat and a struggle ensued." *Id.* at 199. Both passengers then jumped from the cab and began to demand the driver's money just as a police car came around the corner, at which point they ran, with the two officers in "close pursuit." One of the officers pursued the two into "a brightly lit alleyway," at which point he was eight to ten feet from them; he apprehended one of the men, recovering a .32 revolver on the ground near the man; the driver then positively identified that first man in a showup at the scene. The other assailant, the defendant, escaped. Based on his and the driver's recollections, the officer described the escaped assailant as five feet eight inches tall, 170 pounds, and wearing a three-quarter-length black leather coat. The defendant was arrested later that morning; one of the detectives who arrested him described him at that time as six feet tall, 180 pounds, in a three-quarter length black leather coat. *Id.*

A few hours after arrest, at a lineup of about six black males at the police station, the driver identified the defendant. The driver "identified Pierce by kicking him in the seat of his pants and [the second robber] by touching him with his hands. When asked why he had kicked Pierce, [the driver] testified that it was because Pierce had hit him on the head and neck the night before. *Id.* No photos were made or any notes taken of the lineup; defendant was still

wearing the three-quarter length leather coat.[8] The police officers and the taxi driver apparently identified the petitioner Pierce at the same time at the lineup. The district court in *Pierce* accepted as true the finding of the Illinois State Court: "[T]he lineup was conducted in the presence of at least two robbery victims who were able to discuss the identification . . . [and] that only the two suspects, one being the petitioner, were required to wear the distinctive clothing worn by the robbers. . .'." *Id.* (footnote omitted). The district court, however, "rejected Pierce's contention that he and [the second robber] were required to wear handcuffs during the lineup." *Id.* at 200, n. 3.

Both the Illinois Supreme Court and the federal habeas court in *Pierce* concluded that in some respects the lineup was unduly suggestive; similarly, this Court has found the showup/lineup in the instant case was suggestive in some respects as well, although far less than in *Pierce*. Both courts in *Pierce* nevertheless, "concluded that a *per se* exclusion of identification evidence was not necessary and considering the totality of the circumstances concluded that there was not a substantial likelihood that Pierce had been misidentified." *Id.* This Court concludes that Virginia as well would not hold that a *per se* exclusion of the result of the somewhat suggestive showup in this case was necessary, because, as in *Pierce*, no substantial likelihood exists that the Defendant was at that showup, or would be at trial, misidentified as a result.

On the issue of the presence of more than one eyewitness at a lineup, the Seventh Circuit wrote, "[t]he practice of allowing two identifying witnesses to be present during each other's identification has been severely criticized, because it is 'a procedure said to be fraught with dangers of suggestiveness'." *Id.* (citing *United States v. Wade*, 388 U.S. 218, 234 (1967), and Note, *Pretrial Identification Procedures — Wade to Gilbert to Stovall: Lower Courts Bobble the Ball*, 55 Minn. L. Rev. 779, 775 (1971)). The court continued, "Similarly, we disapprove of the fact that both Pierce and [the second robber] were the only two in the lineup wearing black leather coats, which coats had been an integral part of [the taxi driver's] description of his assailants. Requiring suspects to wear distinctive clothing during their participation in a lineup has also been extensively criticized. Finally, the fact that no photograph was taken of the lineup participants or the lineup itself and that no written record of the lineup could be produced at trial is not approved procedure." *Id.* at 200-01.

---

[8] In contrast to the detective, defendant and the other robber claimed there were only four men in the lineup, the other two dressed in beige or tan trench coats, with only defendant and the other robber in black leather coats. They also claimed they were wearing handcuffs at the time, but the driver did not remember anyone with handcuffs on and the detective denied it.

It should be noted that the suggestive lineup in *Pierce*, which the court criticized as being a procedure that could have been cured, took place at the station, where other clothing, particularly an outer garment such as a black leather coat, could have been changed or eliminated, and photographs made easily. Such is not the case when witnesses are shown suspects at a lineup or showup at the scene, immediately after a crime has taken place. The other people at the scene in our case were not already locked up at the police station and therefore were perhaps unfairly, forced to participate in a lineup anyway; to take their photographs at the scene would have been not only more difficult or even impossible, as there is no evidence that the squad cars had cameras, but the participants might not have given permission for that more permanent record of their participation in the showup/lineup. Also, the police would not have had at hand at the scene other clothing to use to substitute for the Defendant's clothing. It was not an outer garment, which could have been easily removed at the station, but rather Defendant's only top clothing, with no other top to substitute.

The court in *Pierce* was highly critical of the station house procedures, referring to "[t]he enormous suggestive power of groups in modifying perceptions, attitudes, and norms," and "the potency of group pressure in modifying judgments" where "some witnesses . . . may markedly tailor their reports to the majority position," and communicate "with or without police knowledge. . . ." The court quoted further from the same source, "Without knowing it, witnesses may alter their beliefs to conform with those of others because either a lack of confidence in their perceptions or desire to make contradictory perceptions fit together. As one might expect, the problems of influence and suggestibility are compounded by the fact that subjects are typically unaware of their yielding behavior." *Id.* at 201 (citing Levine & Tapp, *The Psychology of Criminal Identification: The Gap From Wade to Kirby*, 121 U. Pa. L. Rev. 1079, 1110-14 (1973)). The appellate court also referred to a proposal by the American Law Institute "that distinctive clothing should not be used at lineups." A.L.I., *A Model Code of Pre-Arraignment Procedure*, 160.2(1) (tent. draft No. 6, April 1, 1974). Such procedures "decrease unnecessarily the reliability of any identification made," and in both cases police purposes "can be achieved without increased burdens or decreased efficiency, while at the same time making any lineup identification more accurate. Thus, given the potential for error caused by group pressure, and the only minimal increased burden created by requiring all identifications to be made separately, there would seem to be no excuse for allowing a procedure which permits two or more witnesses to discuss their identifications." *Id.* at 201.

Despite these criticisms, however, the Seventh Circuit nevertheless concluded that the issue was only "whether the procedures employed violated petitioner's due process rights." For that determination, it reviewed Supreme Court rulings using the "totality of the circumstances" test, rather than a *per se* exclusionary result, even for a lineup that was "unduly suggestive," in part because of a multiple witness identification problem. *Id.* at 203. The court went on to affirm the district court's denial of habeas relief. It cited first that the taxi driver had the opportunity to view Pierce and his accomplice standing beside their car as they hailed him with streetlights on and viewed them as they entered the cab with the dome light on just before and after the struggle, including when the two were outside the cab demanding the driver's money, with the rear door open so the light inside the cab was on. *Id.* at 204. Not only was the driver's description accurate, the court pointed out, but he had a high level of certainty at the lineup by his method of selecting Pierce as one of his assailants,[9] and little time had passed when the lineup took place the morning following the attempted robbery. *Id.* at 204-05. Thus, the court found, there was little if any likelihood of a mistake in identification induced by a suggestive lineup.

Thus, even though there were two identifications made by two eyewitnesses present at the same time at an otherwise suggestively conducted lineup, the court still upheld the identification, under circumstances even less reliable than those in the instant case. Here, the opportunity to view their assailants by Crummitt and Reyes was at least as ample as that of the taxi driver's; the descriptions they gave were just as detailed; both witnesses here stated they were absolutely positive for their level of certainty at the showup; and the length of time between the crime and confrontation was far less in the instant case than in *Pierce*, offering a rationale for why perfect procedures were not followed here that was not present in *Pierce*.

In *Hamele v. Mason*, 577 F. Supp. 439 (D. Conn. 1983), on habeas, the U.S. District Court, as had the state courts, refused to find a suggestive pre-trial identification should have been excluded. The facts were not in dispute; a husband and wife were awakened in their home about 4:30 a.m. by an intruder, who was carrying a gun and a flashlight, demanded money, and then forced the female victim to tie her husband with stockings, took more money from her purse, sexually assaulted her, and then tied her up. A few minutes later the male victim freed himself and called the police. Because it was dark, neither victim had gotten a good look at the intruder's face, but they gave the police a description of the general appearance, including clothes and voice,

---

[9] The driver kicked one of the two defendants to identify him.

which was "particularly distinctive in the pronunciation of certain words." *Id.* at 441. Defendant was stopped in his car a few minutes later by police, about two and a half miles from the home; he matched the description on the police broadcast, and a gun and flashlight were taken from his car. Upon being taken to the victims' home, he was shown to them three times, each as he stood outside an exterior screen door so the victims could observe him; on two of the showups, he was asked to speak certain words. The male victim was unable to identify the defendant as the intruder, although he noted similarities, but the female victim, although unable to identify his face, positively identified him as the intruder based on his "build, dress, voice, and diction." *Id.* at 441-42.

The federal trial court found "that the 'showup' identification procedures in the instant case were inherently less reliable than a 'lineup,' and therefore as a matter of law are constitutionally suspect." *Id.* at 442 (citations omitted). It then applied the five *Biggers* factors to determine whether, under the totality of the circumstances, the identification was reliable despite the suggestive confrontation procedure. *Id.* The court then found the two had ample opportunity to observe the height, weight, dress, and voice, as well as sufficient time to fix those in their minds. The court assumed, under the circumstances, that the victims "had their eyes riveted on the intruder who was carrying a flashlight and a gun." The court found their descriptions were sufficiently accurate to enable the police to detain the petitioner within minutes of the crime and that, as to level of certainty, the female was definite in her identification, although the male only noted similarities between the two. Both testified at trial that, although they could not identify his facial characteristics, he was the person who was shown to them at the showup. Further, the identifications were made within two to three hours after they had initially observed him, when his appearance "was still fresh and vivid in their minds." *Id.* at 442-43 (citations omitted). The court concluded that "the victims' identifications of petitioner were reliable and, therefore, were not so constitutionally tainted as to bar their admission at trial." *Id.* The descriptions in the instant case, in contrast, were more detailed and included the victim's face. The certainty levels were greater as well.

In *People v. Adams*, 53 N.Y.2d 241, 423 N.E.2d 379 (Ct. App. 1981), the highest court of New York dealt with the "novel issue" of whether identifications made at "a stationhouse showup should have been excluded as a matter of State constitutional law" from a trial involving robbery of a Bronx stationery store. Three men entered the store at 4:30 p.m.; the owners, Mr. and Mrs. Mangoubi, and their nephew, Darwish, were in the store — the owners on either side of the counter with the cash register and Darwish working at the front of the store. The defendant held a gun to the owner/wife's head while

one of the others took $42.00 from the cash register. Five or ten minutes after they entered, the husband/owner screamed and the men ran out, pursued by the male owner and Darwish. A private security guard and a police officer happened to be nearby, the officer in a police car, and they were able to seize one of the robbers, Sanabria, and recover from him a bag with the $42.00, as well as an imitation pistol discarded by the defendant as he ran from the store. Information from Sanabria led the police later that afternoon to arrest defendant and a third co-defendant at a Bronx apartment, where they were hiding. By 6:30 or 7:00 p.m., the owners and their nephew were at the station, where they identified all three defendants.

Before they did so, however, a policeman suggestively informed the victims "that he thought they had the robbers." When the victims were brought into the room, they saw three men, including the defendant, standing with their hands behind and near the small of their backs, with a police officer behind each, holding him. At that point, the owner shouted those were the robbers, to which the nephew agreed. At a pre-trial hearing to suppress that out-of-court identification, as well as any in-court identification, the state trial court found that the one witness' recollection of the showup was confused with another case and therefore granted the Motion to Suppress that witness' identification. The court further found that "the station house identification was not unduly suggestive and that, in any event, each of the victim's observations during the robbery provided an independent source for any in-court identification." The police officer and security guard therefore were allowed by the trial court to identify the defendant at trial, as were the male owner and his nephew.

The appellate court upheld the trial court's determination that there was an independent source for the in-court identification by the victims, because that factual determination was supported by sufficient evidence to be affirmed. However, it found that "under no view of the evidence could it be said that the station house identification was not suggestive." *Id.* First, the court stated there was no lineup, but rather a showup. "The victims were shown only the suspects in custody. . . ." *Id.* In addition, it was suggested strongly to the victims that the defendants were in fact the suspected robbers. The court also found suggestive the fact that each was held by a police officer during the showup. None of those factors was present in our case. What was relevant to this case, however, was that the New York court found that "[s]howing the suspects together also enhanced the possibility that if one of them were recognized the others would be identified as well. It was particularly unfair in this case because the defendant, who was not apprehended at the scene, was shown together with Sanabria, who was arrested immediately outside the store

and was undoubtedly more familiar to the victims, who could hardly have any doubt of his guilt. Finally, permitting the victims as a group to view the suspects, increased the likelihood that, if one of them made an identification, the others would concur." *Id.* Here, in contrast, Defendant was not suggestively shown with a co-defendant captured at the scene. In fact, only one of the six facts pointed to by the New York appellate court, the fact that the victims of the group viewed the suspects together, was present at the lineup in this case. In addition, this case, unlike the situation in *Adams*, suggests there was a need for police to use any suggestive procedures, whereas the court in *Adams* found no apparent need for such a flawed procedure. The showup did not occur at the scene of the crime soon after the robbery. It was held at the station house several hours after the crime had been committed. There is no indication that it would have been unduly burdensome at the particular place and time to form some kind of lineup or at least to place others in the room besides the suspects and their obvious custodians. Certainly there was no justification for permitting the witnesses to make a collective identification." *Id.* The court went on to point out that, in "the interests of prompt identification, procedures that are less than ideal may be anticipated and tolerable," but that such was not necessary in *Adams*, where the procedures could "hardly have been more suggestive and there is no conceivable excuse for applying these procedures." *Id.* In contrast to *Adams*, the instant case was in fact a lineup, albeit flawed. It took place within fifteen minutes of the crime, close to the scene, rather than at the station house, therefore the interest in prompt identification justified less than ideal procedures. As the court stressed in *Adams*, what may be tolerable at the scene may not be acceptable at the station house.

Despite all its criticisms, the court in *Adams*, found that, despite any error in allowing the results of an out-of-court suggestive showup, those witnesses would still have been permitted to identify the defendant in court because their recollections were based, as the trial court had found in *Adams*, on a "independent source." Because of those proper in-court identifications at trial by the five eyewitnesses, any error in presenting the suggestively obtained out-of-court identifications did not require reversal, especially as two of the witnesses at trial did not attend the showup and the other three had an independent basis for their in-court identifications, as found by the trial judge. Thus, the appellate court upheld the trial result, finding that, if it was error to allow the out-of-court identifications by the two witnesses, such error should be "deemed harmless." *Id.*

In *United States v. Redman*, 414 F. Supp. 61 (D. Del. 1976), the petitioner, a state prisoner named Smith, filed a habeas petition with the

Federal District Court on his conviction for theft, claiming it was based "on a constitutionally impermissible simultaneous 'showup' before three witnesses." *Id.* The facts were that employee # 1 of a Goodyear retail store in a mall was returning from lunch to his store when he saw "a distinctive red customized Cadillac El Dorado parked in front of the store," with a two-digit vanity license plate. He then noticed a black male wearing a multicolored shirt and a white hat leaving the store with a box, which was usually used to pack portable air conditioners, which box the man placed in the Cadillac. Employee # 1 went into the store, realized an air conditioner was missing, and called the police. A few minutes later, he saw the Cadillac parked in front of another store in the mall, about 100 yards away, and sent a second employee in a truck to block an escape by the Cadillac. The second employee stopped his vehicle, got out, and approached the driver's side, but the driver of the Cadillac attempted to flee, forcing the second employee to jump aside to avoid being hit. At that point, Employee # 2 noticed the driver was wearing a multi-colored shirt and a white hat; a third employee also saw this incident. A police officer, one who was familiar with the petitioner and his unique automobile, arrived at the store shortly after and gave chase to the Cadillac, stopping it and returning to the store with the petitioner fifteen to twenty minutes after the initial theft. The officer first interviewed the three witnesses to get a general description of the thief and then showed petitioner to the three employees. Employee # 1 identified petitioner as the thief based on his hair, coloration, height, weight, and clothing; the other two employees, who were there at the same time, "immediately thereafter likewise identified the petitioner." *Id.*

Refusing to apply a *per se* exclusionary rule, the federal district court applied the factors cited in *Biggers* to determine the reliability of the in-court identifications made by the witnesses under the totality of the circumstances to determine whether the identification procedures were so suggestive as to violate due process. Among other suggestive factors, Smith contended that the identification of him by the first employee in the presence of the other two "influenced and tainted the identification by" the second two. Citing the D.C. Court of Appeals, the federal trial judge wrote "simultaneous viewing of one suspect by several witnesses should be avoided," but held that, under the circumstances of Smith's case, the method employed was not constitutionally impermissible, even though it may have been unnecessarily suggestive, because the in-court identifications "clearly were reliable" and thus did not deny Smith due process. *Id.* (citing *United States v. Wilson*, 435 F.2d 403, 405 (D.C. Cir. 1970) (footnote omitted)). The *Biggers* factors should be evaluated to determine whether the presence of several eyewitnesses at the same identification lineup or showup constitutes a constitutional violation; a *per se*

rule exclusionary rule was not the proper standard. *Id.* As the Fifth Circuit wrote in *Rudd v. Florida*, 477 F.2d 805 (5th Cir. 1973), a *per se* exclusionary rule is erroneous when judging "simultaneous identifications by two or more witnesses," because "pretrial identification procedures should not be found impermissibly suggestive on the basis of rigid application of categorical rules." The court added, "[E]xigencies of efficient police work may occasionally justify identification procedures that in other contexts would be unnecessarily suggestive. Because of these and other variables spanning the range of human experience, courts have wisely counseled against determination of constitutionally impermissible suggestiveness on other than a case-by-case basis. . . ." *Id.* at 812.

In *Hogan v. State*, 280 Ark. 287, 657 S.W.2d 534 (1983), the Supreme Court of Arkansas affirmed a conviction on two counts of rape in a case in which the sole issue was the procedure for the pre-trial photo identification of defendant by the rape victims and its alleged impermissible suggestiveness, which defendant claimed tainted the in-court identification as well. The facts as found were that the two rape victims were walking across a bridge around midnight "when a black male came up from behind them, put an arm around each girl's neck, stated that he had a gun, and ordered them to continue walking with him or he would kill them." *Id.* After they had walked some distance to the end of the bridge, which was well lighted, the rapes took place under the dark portion of a bridge. The two girls picked the defendant out of six photos shown them by the police about a month later as they sat at a table about three feet apart while each looked at the photographs. Although instructed not to communicate or indicate their choices to one another, the first girl stood behind the second girl after looking at the photos and making her own choices in her mind, she testified. When the second girl "almost instantaneously announced her choice, the first girl said that was her choice also." *Id.* at 288. At the pretrial hearing, the second girl claimed that the first girl's identification was of two photographs, neither of which was the defendant, but the first girl claimed that, of the two she initially selected as "possibilities," one was the defendant. She further stated she had already made up her mind which one was her attacker before the second girl made her selections. The defendant argued that "the identification by the second girl suggested an identification to the first girl, making the photographic lineup impermissibly suggestive and thereby tainting the in-court identification of [defendant]." *Id.* at 289. After the testimony in the Motion to Suppress before the trial, the Arkansas trial court allowed the identification to come into evidence. The appellate state court upheld that finding, stating that the simultaneous viewing of photographs should be avoided, but that the trial

court's refusal to suppress the pre-trial identification as impermissibly suggestive under the totality of the circumstances test [was not clearly erronious].

In the instant case, even if the showup was suggestive in the only three ways suggested by the Defendant — the Defendant was the only person in the showup in a tank top, perhaps the only one not brought out from the house, and several witnesses were together at the showup/lineup — those suggestive factors are far outweighed by the favorable nature of the five *Biggers* factors, thus allowing the constitutional survival of the out-of-court identification. Each witness provided a detailed description of the Defendant prior to the showup; each had enough opportunity to observe; each was certain of his recognition of the Defendant, Crummitt saying, "That's him" almost immediately and Reyes saying, "That's him" at about the same time, but also making certain by asking the police office to have the Defendant turned around until Reyes was positive about his identification. Even if the Court were to find the showup/lineup suggestive, factors such as the opportunity to view at the time of the crime and the independent prior descriptions indicate that there is not a substantial likelihood of misidentification at the showup. Not only do the out-of-court identifications by Crummitt and Reyes have no substantial likelihood of misidentification, but any in-court identifications by the two eyewitnesses also will be admissible for the same reason, because this Court finds that their source is the view of Defendant at the time of the crime, not any suggestiveness from certain circumstances of the showup/lineup.

## Conclusion

Under the totality of the circumstances, in sum, even though the police procedures may have been somewhat suggestive, the witnesses' prior detailed descriptions of the Defendant and other factors show that their out-of-court identifications are sufficiently reliable that there is no substantial likelihood of misidentification. Therefore, the out-of-court identifications of the Defendant by Crummitt and Reyes, and any in-court identifications given at trial, will be admitted.